Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

_____

RALPH MITCHELL and JODI MITCHELL,

Plaintiffs,

v.

WILLIAM E. ROSENTHAL,

Defendant.

_____

REMOTE DEPOSITION OF DR. MICHAEL FREEMAN

November 2, 2021

Pursuant to Notice taken on behalf of the Defendant at Portland, Oregon, at 10:03 a.m., before Mindy M. Wolf, Professional Reporter and Notary Public within Colorado.

EXHIBIT

8



Page 34

Q. Okay.

A. Yeah, they're -- they're term for a coroner is a procurator fiscal. I had no idea.

Q. I don't know their doctors, only their lawyers.

So as a forensic epidemiologist, how does your testimony help the jury understand the facts of this case?

A. My testimony only helps the jury understand the relevance or applicability of the opinions from the defendant's experts. The entire scope of my involvement in this case is just to examine and then describe my -- examine the methods and opinions of the defendant's experts.

And I'm going to call them that, hopefully, not to be -- I don't want to sound rude. But since they both signed the report, Dr. Clark and Mr. Weimer, if it's okay, I'll use the -- term of the defense experts, that's who I'm referring to.

To understand the -- whether there is any helpful information with regard to the cause of conditions currently diagnosed in Mr. Mitchell by his clinical physicians and other clinical physicians as it relates to the trauma that produced the injuries at the time of this crash. I have no opinions about

Page 35

what his injuries are outside of what's in the records. I have no opinions about his prognosis. It's strictly -- my opinions are just -- and truly, they are relatively brief -- about what it is that Dr. -- the defendant's experts have described in their report and how that analysis may or may not relate to Mr. Mitchell.

Q. So if the -- if Dr. Clark were testifying, there would be no need for you to testify; is that right?

A. Did you say if he were not to testify?

Q. Right.

A. That's correct. That's completely correct.

Q. And you're commenting or aiming to clarify or comment on his -- on his report, his analysis and methods.

A. That's correct. And certainly, not on Dr. Clark. I mean, nothing of this is, you know, personal of any nature. I'm sure he's very well qualified to do what he does. It's strictly his methods and how he -- those methods apply to Mr. Mitchell.

Q. Okay. And what do you understand Mr. Clark -- Dr. Clark's methods were in evaluating

Page 36

this case?

A. Well, he basically did two things: He performed an analysis of a hybrid dummy head in a -- I think it was a finite element analysis -- to evaluate the MPS, the strain that would be calculated on the brain, which is basically the information that's come from NFL football player studies. And then talked about a bound -- a boundary of values that came out of that analysis and how it related to the probability of concussion.

While there are numerous problems with using these data to say anything about a person who's not a football player and is not sustaining helmet impacts, because his conclusion was, yeah, I guess a concussion could have resulted from this -- this head impact on the pavement, which I think is a fairly common sense inference.

But I have no comments about that. I mean, he might as well have testified for the plaintiff in that case by saying he did a biomechanical, and, yes, a concussion was perfectly reasonable or even probable.

The second part of -- was he talked about this traumatic -- this traumatic injury resulting in neurological disorder. And he talked

Page 37

about a study that was done that looked at various positions in football, you know, as far as player positions, and the number of repetitive head traumas that they sustain, and the cumulative trauma that is all the trauma that adds up, and its probability of causing this traumatic injury -- traumatic -- traumatically induced neurological disorder -- TIND, I'm just going to call it, TIND, if that's okay.

Q. Yep.

A. So that is what my confusion was because a TIND -- I mean, the name, traumatically induced neurological disorder is a concussion that would fall under that heading.

But the study that he referred to, which is by an author named Karton, K-A --

(Phone ringing.)

A. K-A-R-T-O-N.

THE REPORTER: Thank you.

A. Doesn't really talk about what these injuries are. And Dr. Clark, who I assume wrote this part of the report, doesn't describe what a TIND is. I mean, this man has a concussion; he's got broken ribs. He obviously struck something very hard to get these injuries, and there was certainly enough force to cause a concussion, and then all his medical



MAGNA
LEGAL SERVICES

Page 54

relationship.

The relationship is not disproven [sic], that's my point, by a biomechanical analysis that says I just can't explain how the injury occurred. That is insufficient to say it's not biologically -- it's biologically implausible. Because those data are so restricted.

You can't look at NFL players and say that someone in a car crash wasn't injured, for example. You can't look at experimental data and say experiment didn't cause the injury, therefore, nobody in the world can get injured. You can't extrapolate from little experiments to say what doesn't happen in the real world.

You can move the other way. You can do something to experiment to cause an injury and say, well, I guess we've shown that this exposure can cause an injury. But you haven't proven that this exposure cannot cause the injury in the general population by such experiments. And that's where there's a disconnect between the way biomechanics is often used in this can kind of a setting.

Q. Okay. So you said it's well established that head trauma causes concussion. Does it always? Does it have to always cause a

Page 55

concussion?

A. No, absolutely not.

Q. And you said you -- because it's well established that it causes concussion you essentially don't have to use the criteria to determine the credible relationship. Is that -- did I understand your testimony right?

A. Right. It's an established relationship. There's not a question about whether or not falling off the scooter and hitting your bare head on pavement can cause a concussion. And, again, it's -- it's validated by Dr. Clark's analysis, as well.

Q. His analysis was that it couldn't be ruled out, right?

A. I go into that discussion with that language. That doesn't have any meaning.

Q. I'm just asking you if that's what he said.

A. He -- well, he -- he said it a couple of ways. He basically acknowledges that a concussion is something that was likely because he went over that 50 percent threshold. He just then phrased a conclusion that you can't rule out a concussion.

Q. Okay.

Page 56

A. Okay.

Q. So I'm just trying to understand your testimony because you said it's well established that head trauma causes concussion, but then you also said it doesn't necessarily in every case cause a concussion, right?

A. In response to your question, yes.

Q. Yeah. But then you said in this case you didn't have to -- strike that.

In this case, there's an established relationship because falling off a scooter and hitting your head causes is a trauma and causes a concussion, so no need to go through the criteria to establish it. Is that -- am I getting that right?

A. Correct. There is nobody in this case who is saying that falling off a scooter at 4 to 11 miles per hour, per the defendant's experts, is not a plausible cause of concussion. Quite the opposite.

Q. Do you agree that there are minimum thresholds of force below which the average person is unlikely to sustain some sort of injury?

A. If you're referring to the average person, then yes, sure. Those levels are not well established, but they could be found. I mean, you

Page 57

could find out what the average is in the population. Doesn't tell you that an individual doesn't get hurt, but you can certainly say something about what the average individual can sustain with that injury.

I think that's a reasonable -- that's reasonable, and that is supported by good scientific inquiry.

Q. And do you know what the minimum threshold of force is below which the average person is unlikely to sustain an injury?

A. What injury are you referring to?

Q. Well, let's say a concussion. Do you know what the average -- what the threshold would be?

A. No, it's not established. The average person hasn't been tested.

Q. Do you agree there must be sufficient quantity of trauma to result in the diagnosed injuries?

A. Yes. But the quantity required to cause the injury in the individual is defined by the response to the exposure, as well. Because there are two moving parts in that question.

Q. Okay.

A. One is the degree of force, and the other one is the individual's susceptibility of the

15 (Pages 54 to 57)

MAGNA
LEGAL SERVICES

Page 58

individual to force, and because individual thresholds vary widely. You typically don't know if you've crossed threshold for an individual until you have, indeed, crossed it.

Q. Okay. So there has to be an -- you have to know the amount of force involved and the susceptibility of the individual involved to determine whether they would sustain an injury from the event. Is that what you...

A. If you were trying to project forward in time, like if someone said what would it take to injure a particular 45-year-old woman in a traffic crash? And let's say it's a rear impact. Is it a 5, 6, 7, 8, 10, 15, 20-mile per hour rear impact? Well, you can get a concussion at any of those numbers if the person hasn't been exposed to the crash.

You say, so what does it take to cause this person's injury. Well, the problem is we don't actually note their threshold until we cross it. So there's a difficulty there when you talk about individual thresholds.

Q. Well, so let's take this case, Mr. Mitchell's case. Do you know the amount of force that was applied to him in this accident?

A. No, I do not.

Page 59

Q. Okay.

A. All I know it was sufficient to cause a concussion and multiple rib fractures.

Q. And you don't know what his susceptibility, the second prong of your analysis, I guess, you don't know what his susceptibility to cross the injury threshold was, right, except that he crossed it, in your opinion?

A. Yes. We can only learn that retrospectively as to say whether or not this force was enough to injure this person. Because someone else might have had the same crash, broken their ribs, and not gotten a concussion.

Q. Do you agree that there must be a temporal relationship between the first onset of symptoms and the injury mechanism?

A. Yes. The injury event and the onset of the symptoms indicative of injury need to be temporarily linked and temporarily appropriate in sequence. You can't have the problems before the event, for example. Putting the cart before horse, so to speak.

Q. Sure. So is the temporal relationship simply that the accident happens before the complaints of injury?

Page 60

A. Well, in part the symptoms of injury are appropriate as far as when they come on. Nobody breaks their leg and doesn't complain of pain for three weeks; that's instantaneous. Some people, though, might injure their spine and not have problems for a day or two after the crash. Or they might injure their ankle and their spine, but be off of their ankle, and not notice it until they get up and move around after a week, particularly.

So there's -- there has to be an investigation that is specific to the injuries. And then some injuries are sequela. So you have a concussion, which can be instantly recognized, but then the post concussion effects may or may not be present. So it could be diagnosed down the road and then attributed to the initial event. So it's -- there's a multitude of factors that might be applicable on a particular case.

I've done no such analysis in this case. I've not evaluated the temporality, although it's in the records. I mean, I can tell you what's appeared to be appropriate. Nor have I looked at sufficiency of the traumatic mechanism because it's already given by the defendant's experts.

And that, by the way, is the second

Page 61

prong of the three-step analysis that you just described, temporality.

Q. Okay. Do you agree that medical records or testimony need to be carefully examined to determine if the post event symptoms were present were prior to the event?

A. Would you -- would you give me the question one more time?

Q. Sure. Do you agree that medical records or testimony -- or I suppose other documentary evidence that would be relevant -- must be examined to determine if the post-incident symptoms were present prior to the incident?

A. Well, a full investigation needs to be made, for sure, to find out whether or not there is a condition --

THE REPORTER: There is a condition that what?

THE DEPONENT: To find out if the condition was present beforehand.

THE REPORTER: Thank you.

THE DEPONENT: Certainly.

Q. (BY MS. VEDRA) Because that would affect the biologically credible relationship; is that right?

16 (Pages 58 to 61)



Page 98

You know, one percent of the population exists outside the bounds of the 99 percent. But that doesn't do you any good if you're trying to figure out if this person is injured by a particular event.

Q. Is that something that -- certainly you don't have to be a forensic epidemiologist to run through that, as well, do you?

A. That causation methodology that I described is methodology that's used broadly in medicine an in biomedical sciences.

Q. Is that something -- would you agree that an ordinary person could also go through that process and say well, there was an accident, they're complaining of injury, it's temporally proximate, and the other factors that you -- you included?

A. Well, an ordinary person doesn't necessarily know that you can't get a concussion unless you have some sort of a traumatic force introduced into the head. An ordinary person may want to know what the risk of certain conditions are in an individual given their pre-event history which often a -- which is a medical determination saying well, this person must be at much risk. But it also employs epidemiologic concepts, as well. It's a

Page 99

differential etiology, if you will.

And then if you have an expert with a fancy degree who says -- who casts doubt on the likelihood that an injury might result from a particular trauma, then that makes it harder for the person with the common sense to figure it all out.

Q. And that's where you come in.

A. Well, it depends. In this particular case, again, the only thing I'm doing is just talking about this casting doubt on the injury that Mr. Mitchell has, what it is that Dr. Clark and Mr. Weimer have said that might cast doubt on them, I should say.

Q. Okay. But as you have testified and clarified in your supplemental report, they have actually not cast out, they said there is a chance that this caused a concussion, and we can't rule it out, right?

A. And then confused it by saying, but a TIND wouldn't happen or couldn't happen or didn't happen based on the study of football player positions. That's the problem I have, where it's conflicted. I mean, if this gets in front of a jury, I don't know what they're supposed to think when they hear it. And so if it does, then it would be

Page 100

reasonable to have me come in and say I don't think that applies here, and I can't imagine how it does. That's what I could come in and say, generally.

Q. Okay. You wrote that governmental and academic institutions use biomechanical analysis in injury events to determine how a medically observed injury occurred and not whether it occurred.

What -- what are some of those government and academic institutions that you're referring to there?

A. National Highway Traffic Safety Administration; the National Traffic Safety Board; the Investigation Arms of National Automotive Sampling System Crash Worthiness Data Sample; the Crash Injury Research and Engineering Network, which is a government and industry sponsored organization; Insurance Institute for Highway Safety.

Pretty much all academic and governmental bodies use biomechanics to explain how injuries occur or to arrive at solutions to try to reduce the risk of injury in crashes, but never to say an observed injury didn't happen.

Q. Okay. Are you planning on issuing any additional supplemental reports?

A. I've not been asked to as I sit here,

Page 101

so as we're talking right now, nope.

Q. Can you think of off the top of your head what would cause you to issue another supplemental report?

A. If I was asked to do, so probably secondary to some other information, maybe, that was provided by Dr. Clark and Mr. Weimer.

Q. Okay. So in your supplemental report, Exhibit B, at the end of the first page you wrote that your opinion is that the entirety of the defense experts' analysis as described in the report is moot to any issue relevant to the defense of the cause of Mr. Mitchell's injuries.

What exactly do you mean by that?

A. That there -- that the entirety of the analysis is looped to any issue relevant to the defense of the cause of his injuries. What is meant by that is that you can't -- you can't use an opinion that a concussion was probable in this crash to say that the -- that the injuries that were observed didn't happen. So that makes parts of the opinion moot.

And that the opinion of repetitive head traumas don't cause TIND at the level at which Mr. Mitchell sustained them has no meaning,



MAGNA
LEGAL SERVICES

Page 102

whatsoever, with regard to Mr. Mitchell because there's no allegation that he sustained repetitive head traumas, and there's no clarification even what is meant by a TIND, that it's not a diagnosis that is any of his records, and Dr. Clark is, obviously, diagnosing him with any kind of condition.

So that makes his opinions moot. They have no possible relevance to any disputed issues in this litigation that, I can understand, anyway.

Q. So when you say "moot to any issues relevant to the defense," was it your initial understanding that Dr. Clark or the defense was premised on the fact that this didn't happen, or there was no concussion or injury? And now you've realized that's not the case?

A. No. Well, I mean, saying that the TIND didn't or couldn't have resulted from the event is something that is confusing. It's a point of confusion. So I would go back to that -- that point, that the term sounds like it could be referring to concussion. But the way that Dr. Clark was using it, it seems that it's not. But it just -- there's no clarification for it. I don't know if that's helpful at all. Probably not.

Q. You've stated that you are certified in

Page 103

accident reconstruction, but you didn't do one of your own, right? You didn't go into the calculations and the speeds. You relied on information from other experts; is that correct?

A. Well, again, I didn't even do any kind of an analysis of the forces. I just analyzed the bases for Dr. Clark and Mr. Weimer's opinions.

Q. And that's all you intend to testify to?

A. It is.

MS. VEDRA: I think those are my questions. Thank you, sir.

THE DEPONENT: My pleasure.

MR. OGBORN: I have no questions. What is your preference with regard to reading and signing?

(Discussion off the record.)

THE VIDEOGRAPHER: We're now off the record at 12:38.

WHEREUPON, the deposition was concluded at 12:38 p.m.)

Page 104

CERTIFICATION

I, Mindy M. Wolf, Professional Reporter, appointed to take the deposition of
DR. MICHAEL FREEMAN,
certify that before the deposition the deponent was duly sworn to testify to the truth; that the deposition was taken by me on November 2, 2021; then reduced to typewritten form, by means of computer-aided transcription; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not related to any party herein or their counsel and have no interest in the result of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand on November 23, 2021.

_____
Mindy M. Wolf
Professional Reporter




MAGNA
LEGAL SERVICES