Page 14

there's an overlap, but it's not the same thing.

Q.   What's the difference?

A.   Biomedical engineering is a particular or -- biomechanical engineering, they're pretty much the same thing for different programs -- are engineering programs.  Typically, they're graduate programs for engineers.  You don't have to be an engineer to do the program, but you typically have to -- most people who do the programs are engineers.

Biomedical engineering primarily focuses on the technical aspects of how you test the interaction of the human body with mechanical devices.  So biomechanical engineers do tests on things like strut graphs for spinal surgery or plates for fusion or screws to look at how well they implant into bone.

Biomechanics, which is a more broad area is just -- injury biomechanics, specifically, the area I come at it from -- is just what how do -- what is the path of psychologic process by which injuries are produced secondary to trauma. It's basically a combination of the physics of the event and the understanding of how it affects the body.

Q.   And to clarify, you said "biomedical" a

Page 15

couple of times.  But Dr. Clark is a mechanical engineer; is that your understanding?

A.   Yeah.  The terms are interchangable, they're just different names for the same program. So it depends on where you went to school.

Q.   Okay.  And what's -- what is forensic medicine?

A.   Well, broadly, that's just the intersection between medicine and law.  It covers a wide variety of areas in subdisciplines.

Q.   And you're an expert in that?

A.   I am.

Q.   Okay.  So you don't have any plans to testify about biomechanical engineering or engineering in general; is that right?

A.   I'll be talking about the -- no, I'm extremely narrow in this case.  I'm going to talk about the report from Dr. Clark and Mr. Weimer.  I'm going to talk about whether or not they have any application in this case to the injuries that were observed in Mr. Mitchell.  I'm not going to really -- I'm not going to be getting into issues of -- you know, they calculated their strain incorrectly.  I'm not going to be talking about that.

So I would say that my opinions with

Page 16

regard to the biomechanical aspect are relatively minimal.  My opinions really largely just relate to how is this evident.  Is this -- could this evidence be used in a causal assessment of the injuries that are diagnosed in Mr. Mitchell.

Q.   And that relates to the forensic medicine aspect of it, right, the intersection of law and medicine?

A.   Yes.

Q.   So is it your intention to testify regarding an analysis of Dr. Clark's methods and how he arrived at his opinions?

A.   In part, yes.

Q.   Okay.  Can you explain that to me?

A.   Sure.  I'm -- Dr. Clark did a analysis of the crash, assuming a certain falsity and impact to Mr. Mitchell's head.  I'm not going to get into the specifics of how he did that -- a finite element modeling program, which I use a finite element modeling program as well.  But I'm not here to disagree with the methods of how he arrived at his values because that part of his analysis actually said, yes, this is consistent with a concussion.

The methods I'm going to take issue with is discussion of a measure of cumulative head

Page 17

trauma as it relates to trauma induced neurological disorder, something called TIND, which is in his report, which he claims is part of Mr. Mitchell's diagnoses.  That methodology and how his conclusions relate to Mr. Mitchell with regard to that particular aspect of his analysis is the area that I would be discussing his methods and disagreeing.  That's where my main disagreement is.

Q.   Sure.  So was it your -- and we're getting a little ahead of ourselves, but since we're talking about it -- is it your interpretation of Dr. Clark's analysis that he concluded that Mr. Mitchell suffered from cumulative head trauma or something similar to that?

A.   Well, that's a good question because he used an analysis of cumulative head trauma, and it appears that's what he's talking about.  He said repetitive -- RHI, repetitive head injury or repetitive trauma -- that's the -- all the analyses that he's referring to say he did he doesn't think that Mr. Mitchell has what he calls a trauma induced neurological disorder.

Which created my conclusion in my initial report because a trauma induce neurological disorder is also a concussion by definition.  Yet, he

5  (Pages 14 to 17)

Page 22

newer documents I looked at after my -- I submitted my report, but that's about it.  Not very much, a couple hours.

Q.  What were the new documents that you reviewed after you submitted your report?

A.  Those were the rebuttal reports, or at least the rebuttal disclosure.

Q.  The defense expert reports, rebuttals?

A.  Yes, two of the defense expert reports. That's correct.

Q.  Oh, they were plaintiff's rebuttal reports?

A.  Yes.

Q.  Okay.  Did you read any of -- besides Dr. Clark's -- any of the defense expert's report?

A.  Well, if you recall, I said I wasn't sure -- I got a list of seven or eight or so expert reports, and I can't recall offhand if any of them were defense experts versus plaintiff.

Q.  Okay.  That's fair.

Are you planning to travel to Colorado in April for trial?

A.  I haven't discussed it with anybody, as I sit here.

Q.  If you're asked, would you travel?

Page 23

A.  Assuming that we're not in the -- at the height of a world-wide pandemic at that point in time, I probably would.  My preference, obviously, is to sit here and talk to you on Zoom.  And that's -- certainly would be the first thing that would be offered.  That would be, definitely, my preference.

Q.  Okay.  So let's go through your CV because it's interesting, and I just want to go through.

So the first thing you have listed is the Doctor of Medicine from the Swedish University. When did the obtain that degree?

A.  2013.

Q.  And as I understand it, that is not the same thing as an MD or medical doctor in the U.S.; is that accurate?

A.  Yes.  It is an academic of scientific medical degree.  It represents four years of clinical medical training to actually be admitted to the program.  But it represents, primarily, four years of medical science training, which is what I did for the four years I went back and forth to Sweden.

So it's closer to an MD-PhD without licensure for the MD.

Page 24

Q.  So when you say "medical training," what did that consist of?

A.  Well, if you go back into my, you know, my past training I was initially trained as a chiropractor, four-year degree, so the first two years in basic medical sciences.

Then I have a year and a half of infectious disease and other disease training in my PhD for epidemiologist.  And then I have three years MD training at a program at University of Health Sciences at Antigua, which allowed me to conduct all of my -- what are called clerkships in my immediate area where I was living at the time, which is where I live now, which is in Oregon.

So I did three years of clinical rotations.  I roll all that together, took them to the school and said, Do I qualify for your program? And they said yes.  I was admitted to the program, and then I began studying for --

Q.  You mention Antigua.  That's the country in the Bahamas or the Caribbean?

A.  Sorry, I wasn't -- did I trail off?  I was -- I was still going.

Q.  Oh, sorry.

A.  Well, that's okay.  Maybe you didn't

Page 25

hear me.

Q.  Yeah.  Well, let's just break this down a little bit because I know there's a lot to talk about.

Did any of these rotations involve actual treatment, patient's diagnosis?

A.  Yeah, of course.  They're medical rotations.

Q.  Okay.  And that was through the school in Antigua?

A.  They were the ones who arranged the rotations.  The rotations were all with board certified physicians in the United States.

Q.  Okay.  You mentioned your chiropractic training.  Is it true that you haven't practiced as a chiropractor for more than 20 years?

A.  Oh, yes.  Yeah. I'm definitely not -- what I do now is what I did, you know, almost 40 years ago.

Q.  Sure.  Okay.  And you mentioned the program in Sweden, the med doctor program.  That sounds like the American equivalent of a PhD program; is that fair?

A.  Except that it requires four years of clinical medical training.  That's why I said it's

7 (Pages 22 to 25)


MAGNA
LEGAL SERVICES

Page 62

A.  No.

Q.  Why not?  If symptoms were present before, wouldn't that effect whether there was biologically credible relationship between an incident and post-incident complaints?

A.  No.  You can have all the symptoms before.  It wouldn't affect whether or not a trauma could cause a injury.  That's the biologically credible link.

Q.  Okay.

A.  That is a general causation issue. Your question more is -- I think goes to doesn't a person have all the problems before the event that they did afterwards?  So that there is no deviation of their physical condition from before the event and afterwards.  That is an important thing to consider.

Typically, something like a concussion is defined by some onset of symptoms indicative of concussion.  That's how the CDC defines it.

Q.  And your background and training, are you familiar with the sudden onset of those symptoms, what they are?

A.  With 23 years of training, 12 years of medical training, so of that medical training I have quite a bit of training in concussion, diagnosis,

Page 63

concussion evaluation, blunt trauma of the head and neck, even into forensic pathology training, and autopsy practice.  So I have a pretty extensive background on the topic quite a bit, as well.

Q.  But you're not testifying or opining on that in this case; is that right?

A.  Haven't been asked to.

Q.  Okay.  And you haven't put it in your report, right?

A.  Correct.

Q.  Do you -- are you -- strike that.

In your profession, do you need to consider alternative causes of injuries?

A.  Yes, that would be the third step or third prong of the causal analysis.  And, yes, that's critical because that answers the question of would the person have had all these problems if they hadn't been exposed to the trauma.

Q.  And the latter -- your latter statement, rhetorical question, would this have happened but for the trauma?  That is the crux of your evaluation and your opinions in this case; is that fair?

A.  No.

Q.  Okay.

Page 64

A.  My opinions are what I stated.

Q.  Okay.

A.  That there is no TIND here.  It's not described in the records, and this wasn't a cumulative trauma.  So the discussion that a TIND was not likely because there was no moderate to severe head injury, also which is not described in the records, is just meaningless.  It has no applicability to any of the facts in this case, and that the expert is -- these experts have already said we have perfectly reasonable that he got a concussion got a concussion from this crash or -- I'm paraphrasing.  So that's my opinion.

Q.  Okay.

A.  And that's the totality of my opinion is that there's no -- that -- that this report from these experts has -- provides nothing of relevance with regard to Mr. Mitchell's injuries.  As far as I know, nobody's saying he couldn't have got a concussion in this crash.

Q.  So did you go through these three criteria, the biologically credible relationship, the temporal relationship, and alternative causes of injury, are those analyzed or evaluated in your report?

Page 65

A.  No.  Because I'm not doing a causation analysis.  I am strictly doing a rebuttal to what these experts have said.

Q.  Okay.

A.  That's why it's not in my report.

Q.  Okay.  What are the ways a person can sustain a concussion or a mild traumatic brain injury?

A.  Head trauma.  It's a -- the term "trauma," well, traumatic brain injury is a direct implication that some mechanical energy need to be introduced to the head.

Q.  Is it correct that it could either through a single trauma, right, like we have in Mr. Mitchell's case where he fell off the scooter and hit his head on hit his head ground, or you could have multiple blows to the head over time, which accumulate?

A.  No.  That's not how you get a concussion.  A head -- a single head trauma either causes a concussion or it doesn't.  There's no such thing as a cumulative concussion.  There can be cumulative risk of neurodegenerative conditions, which are not really well understood.  That's a completely different condition from what we're



EX. C TO DEFENDANT'S RESPONSE TO PLAINTIFFS' MOT. TO EXCLUDE VSI

Page 66

talking about.

There can be cumulative risk of dementia; there can be cumulative risk of Parkinson's. That risk goes up with more head trauma. But concussion is a per-event condition. It's kind of like a cut, basically. And you get a cut, or you don't get a cut. There's no cumulative trauma to cause a cut.

Q. A number of doctors in this case have testified that concussion and mild traumatic brain injury are synonymous terms that can be used interchangeably. Is that something you agree with?

A. I do. That's how to terms are used often in the literature.

Q. So it sounds like you agree that a single trauma to the head could cause a brain injury, right?

A. Yes.

Q. Okay. And then, perhaps not a concussion, but is it true that multiple blows could, over time, cause a brain injury? Not the same way that a single blow would cause a concussion or a brain mild traumatic brain injury, but do you agree that multiple blows over time, even if insignificant, can cause brain injury?

Page 67

A. Well, we certainly have good evidence for that in the studies of NFL players and collegiate players. In fact, I'm currently doing a study on a topic as part of my -- one of the research --

(Phone ringing.)

MR. OGBORN: Pause a minute. Let me get rid of this. And I'm sorry.

MS. VEDRA: All right. Why don't we -- well, you need to finish your answer before we go off the record.

A. So I'm currently doing a -- supervising a study, which is actually looking at cervical spinal fluid, proteins, and toxins, essentially, in people -- NFL players who have signs of chronic repetitive head injury. So yeah, that's a disease process, rather than an injury, per se.

So the repetitive head trauma can result in a disease process that results in neurodegeneration down the road and signs of dementia, et cetera, et cetera.

MS. VEDRA: Okay. It's been about an hour and half. We can take a break.

THE DEPONENT: Okay.

THE VIDEOGRAPHER: All right. We are now off the record at 11:25.

Page 68

(A recess was taken from 11:25 a.m. to11:35 a.m.)

THE VIDEOGRAPHER: We are now back on the record at 11:35.

Q. (BY MS. VEDRA) Dr. Freeman, when we went off the record we were discussing the ways to sustain a traumatic brain injury, and you were clarifying, I think, the difference between like a single-blow brain injury and the cumulation of multiple events, which would lead not necessarily to a brain injury but a disease process in the brain; is that right?

A. Yeah. That would still be a brain injury. I mean, a brain injury can be acquired over a period of time, or it can be one event. Concussion is always one event.

Q. Okay. Fair enough. And you've raised the football studies, Dr. Clark mentioned them in his report, and chronic traumatic encephalopathy, or CTE, is one of those brain injuries or disease processes that can result from multiple blows to the head over time; is that right?

A. Yes.

Q. Okay. Is there a severity of a blow to the head to get a brain injury from a single -- a

Page 69

single blow? Is there a threshold for that?

A. No, it's not established.

Q. Okay.

A. There's no established threshold. And since we don't have enough information on how people get concussions, we can't say what the average is. We can't say we looked at a 100,000 people -- that's too many -- let's say 500 people who came to the emergency room were diagnosed with concussions, and we went out and reconstructed the events which led to the concussions. Most of them would be traffic crashes or falls, but some are assaults. Well, that would be kind of the major ones of acute concussion. And we just went out and reconstructed those events, so we don't know.

I mean, the person who lies in the -- who's the outlier, the -- you know, two standard deviations from the lead, there's the bottom five percent for being resilient and able to resist a trauma, we simply don't know where that person is, or we don't know what those numbers are.

Q. Okay. So is it true that a single blow that causes a brain injury is usually in the moderate to severe range, or is that something else that we don't know?

MAGNA
LEGAL SERVICES

EX. C TO DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOT. TO EXCLUDE VSI

Page 74

A. No.

Q. Okay. So the speed's referring to the speeds of the vehicles at impact; is that correct?

A. Just the travel speed, actually, is what I'm referring to.

Q. Okay. The travel speeds before impact?

A. Yes.

Q. Okay. Does the speed --

A. If we're talking about the discrimination between what is generally characterized as low speed versus not low speed, that is what I'm referring to.

Q. Okay. Does their speed of the vehicles at impact matter at all in your analysis or review of Dr. Clark's report?

A. Not in the slightest.

Q. Okay. Did you read the Dawson study that Dr. Clark referenced and cited to?

MS. VEDRA: I can bring it up.

THE DEPONENT: Okay. Great.

MS. VEDRA: Well, not the study, Dr. Clark's report, sorry. Just so you can see what I'm talking about.

Did you get Exhibit C?

(Exhibit C was marked.)

Page 75

THE DEPONENT: I have the report open in my -- on my desktop. Can you just direct me to the page you're looking at?

MS. VEDRA: It starts on page eight, the discussion of Dawson.

Q. (BY MS. VEDRA) But first, can you just look at the Exhibit C I sent you and tell me if you recognize it for purposes of the record?

A. Sure. Yeah. I'll just use this document so that there isn't any confusion. And we're on page eight, did you say?

Q. Page eight is where Dawson is first referenced, I believe.

A. Let's see here. One second.

And the question was did I read that paper?

Q. Yeah, because it sounded like you read and took a lot of issue with the Karton study, and I'm wondering if you read the Dawson study as well.

A. I don't have a problem with the Karton study. My problem is using the Karton study to say anything about what happened to Mr. Mitchell makes no sense.

I did not review the Dawson study because Dr. Clark used the Dawson study to say that

Page 76

this crash -- the probability of a concussion being above 50 percent cannot be ruled out. Meaning, that basically a concussion -- as far as he's concerned, a concussion could have occurred, and he's not saying that the concussion is unlikely or didn't happen. So at that point in time it's a moot opinion.

Q. Okay.

A. But, no, I did not pull it specifically for that reason that -- I didn't have anything to disagree with there.

Q. You've -- I think -- is it Karton that's the novel study?

A. That -- novel is in the title of the study, yes.

Q. And novel being it's a new idea or new theory; is that right?

A. Right.

Q. Okay. What's the issue you have with the study or theory being novel?

A. Well, the problem I have with it is when it's being used to say that somebody didn't get an injury that they've been diagnosed with. But I have a bigger problem when you actually read the study, and you find out that it has absolutely nothing to do with the opinion that's being given or

Page 77

the injuries that are diagnosed. So that's the problem.

Q. The Karton study calculates cumulative based trauma exposure like CTE, right?

A. Well, no, CTE can't be calculated. CTE is a postmortem finding.

Q. Okay.

A. So it's a hypothetical that's based on the -- I'm going to pull up the study, if I may.

Q. Well, perhaps the premise of my question was wrong then.

Is it true that the Karton study calculated cumulative based trauma exposure?

A. Yes, that is correct.

Q. And you agree that Mr. Mitchell wasn't subjected to cumulative trauma exposure, right?

A. Right.

Q. Okay. You also reference that many studies have established that ground level falls can be fatal and otherwise quite serious, maybe, to the neck and cause other injuries; is that correct?

A. Yes.

Q. Okay. You agree that this -- the injuries in this issue -- in this case were not fatal, right?

20 (Pages 74 to 77)



MAGNA
LEGAL SERVICES

Page 78

A. I do agree with that, yes.

Q. Okay. There was no skull fracture or spinal cord injury to Mr. Mitchell; is that right?

A. That is correct.

Q. Okay. So like we discussed earlier, the fact that falls can be quite serious or cause things like fatality doesn't mean they have to be; is that correct?

A. Most definitely, that's correct.

Q. You mentioned also in your criticism of the Karton study that it has nothing to do with assessing concussion thresholds in the un-helmeted population of 56-year-old men who sustain a relatively, high-speed, ground level fall against pavement. That's on page seven of your initial report?

A. Uh-huh.

Q. First, what's the -- where does the reference to relatively high speed come from in that statement?

A. If he hit the pavement at 11 miles an hour, that's relatively high speed.

Q. So on page six we said it was moderate speed because it was greater or equal to 10. So is it the same?

Page 79

A. Well, let's go back to -- let's go back to -- if I may, what I wrote, so I'm not talking out of hand here. Now I have to go find my report. Here we go.

So he was ejected from the scooter at moderate speed. But he struck the pavement at relatively high speed.

Q. Okay. So -- well, hang on. Let's clarify some things because you said that you were discussing moderate speed as the travel speeds of the vehicles before impact, and that --

A. That's correct.

Q. Okay. But you're saying you're actually referring to his ejection speed from the scooter, not the speed of the vehicles. Is that -- am I hearing you right?

A. I refer to ejection speed as being moderate. I refer to the crash as being -- where was that that you asked me about that before? I'm trying to find that page.

Q. It's the top of page seven where you call it relatively, high-speed, ground level fall.

A. Yes, but you asked me about it -- I'm trying to go back to where you asked me about it before.

Page 80

So the moderate speed -- oh, that was the only other place I refer to it, is the force of being ejected from a scooter at moderate speed. That would be the -- the speed of the crash I'm using as the speed of being ejected.

The speed of impact then is the speed at which his naked skull strikes the pavement. And I said that's relatively high because it doesn't have to do with vehicles, it has to -- you know, a five mile an hour crash in a vehicle is not a huge, big deal. Typically, not going to have an enormous amount of damage, particularly if it's bumper to bumper. But if you run into a person at five miles an hour, obviously, it's a much more significant issue. So that's really the difference I'm referring to.

Q. I just want -- I appreciate that. I just want to clarify because when I asked you about the moderate speed, you said you were referring to the travel speeds of the vehicles before impact because they were going greater than or more than ten miles an hour. Do you recall that discussion we had?

A. No. I was talking about not -- I was talking about a categorization of what's described as being low speed or moderate speed. And so if you're

Page 81

ten or more miles per hour, that's typically considered moderate speed with referring to a crash. That was the only thing I was referring to.

Q. Do you know the speed with which Mr. Mitchell fell off of his scooter?

A. No. I'm only referring to the numbers that were used by Dr. Clark in his analysis, the 4 to 11 miles per hour.

Q. Okay. And then the -- on page seven, the relatively, high-speed, ground level fall against pavement. What is that referring to?

A. It's referring to the impact of his head on the pavement. And if he hit the pavement at 11 miles an hour or whatever the speed is that's determined, that's relatively high speed. You don't want to hit the pavement at all. It's not like you're hitting a pillow.

Q. Do you --

A. That's why it's relatively high speed.

Q. Well, do you know the speed at which he hit the pavement?

A. I just have the opinions from Dr. Clark that he is 4 to 11 miles an hour.

Q. And 4 to 11 is relatively high speed?

A. To hit your head on a hard surface like

MAGNA
LEGAL SERVICES

Page 86

injury, as opposed to solely a skull injury. So if you just keel over and land and smack your head on something hard, you got to a skull vault fracture, possibly a skull base fracture.

But if you go in and, like, dive into a pool, so that that the first thing that contacts is the head, the head stops and the body continues to accelerate into the skull, basically buckling the neck, then you're more likely to have a neck injury. So that's what it has to do with the degree of inversion.

Q. Okay. Is it -- is it important to know the degree of Mr. Mitchell's inversion at the time of this fall?

A. No. He got his injuries -- his injuries are his injuries.

Q. Okay.

A. They weren't caused by anything other than the fall, no matter how it occurred.

Q. Okay. I think we've cleared this up, but you referred in your initial report to Dr. Clark's methods as specious and causing him to arrive at erroneous conclusions. I'm curious what -- what you consider to be specious about the methods. But correct me if I'm wrong, was that what

Page 87

you think was undue reliance on the Karton study?

A. Yes, and talking about repetitive head injury and the injury which Dr. Clark oddly said was in the records. He said that there was a TIND in Mr. Mitchell's medical records and then didn't specify what that was.

Mr. Mitchell was diagnosed with the chronic sequela of a concussion. He's not been diagnosed with CTE. So I just really am baffled by what Dr. -- what it is that Dr. Clark thinks a TIND is and how that that relates to anything that was diagnosed in Mr. Mitchell. He simply doesn't define it. He just uses the term like it's a widely-used term in head injury medicine, and it's not. It doesn't have any -- it doesn't have any translatable meaning unless he actually says what do you -- if he says what he means by it, then that would be helpful, but he doesn't.

And I know he has a background in writing about, like, lacrosse player head injuries and helmets and that kind of stuff, but -- I mean, he just didn't give us any kind of detail to understand what he was talking about, or why he was talking about repetitive head injury in the context of this case, the cumulative trauma.

Page 88

So again, baffled. This is not somebody who I would -- this is somebody I would expect no know his business when it comes head injury biomechanics based on his publication background, and that's what I was confused about.

Q. Okay. And in your report, your initial report, you made statements again, which I think we've covered, that they -- that Dr. Clark said he could not have -- Mr. Mitchell could not have gotten a head injury or concussion when, in fact, you realize now that's not what Dr. Clark said, right?

A. I think we already did cover that. Yes, I agree.

Q. Okay. So in the -- I don't know, the bottom third of the page seven of your report, it starts in the middle of the second paragraph on that page. And you discuss risk and causation, and you say the chance he would have had a concussion in the absence of the crash at the same point of time is zero, therefore it's 100 percent probable that the car accident caused his concussion.

I'm paraphrasing, but do you see that that part in your report?

A. Yes.

Q. Okay. So am I correct in interpreting

Page 89

that to say he didn't have a concussion before the accident? He complained of one after, therefore, the accident caused the concussion?

A. No, you're not correct to say that.

Q. Okay. Correct me.

A. A concussion is, by definition, only traumatically induced.

Q. Okay.

A. There is no evidence of a concussion prior to the event which was traumatic enough to fracture a number of ribs in his chest. He had symptoms of concussion which were objectified medically by a diagnosis of concussion after the crash.

There are zero competing causes of a concussion other than the trauma that he was subjected to, which from a common sense perspective, if you sustain torso trauma significant enough to cause multiple rib fractures it's not unlikely you would also sustain a head trauma.

We didn't know he sustained a head trauma. He didn't have a specific area of subgaleal hematoma or, you know, contusion on his head. We know he hit the back of his head because we actually have that injury. The idea that he would hit his

23  (Pages 86 to 89)

