IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 1:20-cv-00778-RBJ

RALPH MITCHELL and
JODI MITCHELL

      Plaintiffs,

v.

WILLIAM E. ROSENTHAL,

      Defendant.

---

## ORDER

---

This matter is before the Court on the parties' respective *Daubert* (Rule 702) motions and general motions in limine. Defendant moves to limit portions of the testimony of plaintiffs' vestibular and post-concussion management expert, Lauren Rust, DPT; cognitive-linguistic therapy expert, Ramya Shyam, CCC-SLP; developmental optometry expert, Amy Elsila, OD; neurology and psychiatry expert, Jonathan Woodcock; MD, and accident reconstruction expert, Anne Stodola. ECF Nos. 40-42. Defendant also seeks to preclude plaintiffs from referring to his insurance coverage, revealing his financial status, or presenting certain theories of the case to the jury. ECF No. 41.

Plaintiffs move to limit portions of the testimony of defendant's biomechanics experts, J. Michio Clark, PhD and Zachariah Weimer, MS, PE (collectively, Vector Scientific, Inc.). ECF No. 44. Plaintiffs also seek to preclude defendant from referring to their motives in filing suit, eliciting testimony about the timing of their retention of counsel, or presenting evidence of their health insurance coverage. ECF No. 43.

1

Defendant's motions are granted in part and denied in part.  Plaintiffs' motions are granted in part and denied in part.

## FACTUAL BACKGROUND

Ralph Mitchell was injured on Main Street in Aspen, Colorado on June 27, 2017 when his Honda scooter was struck by a Cadillac Escalade driven by William Rosenthal.  Mr. Mitchell, age 56 at the time, claims to have sustained "severe and permanent" injuries in that accident, including traumatic brain injury.  ECF No. 43 at 1-2.  Defendant is skeptical that the accident caused substantial injuries for various reasons, including that Mr. Mitchell sought medical attention from "many of his 'treaters'" after filing suit, that the forces involved in the accident were—at least according to calculations by defendant's expert—insufficient to produce the type of injury now alleged, and that the results of a brain MRI performed shortly after the accident were "essentially normal."  *See* ECF No. 50 at 6; ECF No. 49 at 6; ECF No. 44-7 at 4. Defendant also objects to much of the expected testimony from plaintiffs' experts about the cause of Mr. Mitchell's injuries and his long-term prognosis.

Immediately after the accident, Mr. Mitchell was transported to the Emergency Department and diagnosed with rib fractures, a collapsed lung, elbow and hip contusions, and a small hematoma at the upper posterior scalp region.  ECF No. 44-7 at 3.  Mr. Mitchell and his wife, co-plaintiff Jody Mitchell, reported that he continued to feel dizzy and foggy in the days after the accident, leading him to seek a head injury evaluation.  *See id*.  On July 12, 2017, Dr. Spence (family medicine) diagnosed Mr. Mitchell with a concussion and the same physical injuries as above.  *Id*.

Mr. Mitchell continued various forms of treatment over the following years: he received physical therapy from July to November 2017 and underwent a brain MRI in November 2017,

the results of which were essentially normal.  *Id*.  However, he continued to complain of deficits in memory, balance, and concentration;  and he presented to neurologists Drs. Bowen and Schmitz in January 2018 and June 2019, respectively, for treatment.  *See* ECF No. 44-7 at 4.  He was diagnosed then with "mild neurocognitive disorder most likely secondary to traumatic brain injury (TBI)" and mild depression.  *See id*.

On March 20, 2020, Mr. and Mrs. Mitchell filed this personal injury action, alleging negligence.  Mr. Rosenthal has admitted fault, but he does not admit that the accident caused all the injuries and damages claimed by the plaintiffs.[1]  Mr. Mitchell then sought additional evaluation and treatment with several providers—including physical therapist Dr. Lauren Rust (beginning in August 2020), neurologist Dr. Jonathan Woodcock (beginning in December 2020), speech-language pathologist Ms. Ramya Sham (beginning in January 2021), and developmental optometrist Dr. Amy Elsila (beginning in February 2021).  *See* ECF No. 42-2 at 1; ECF. No. 40-2 at 1; ECF No. 40-3 at 1.  Through clinical interviews and tests, these providers identified deficits in his balance, visual function, memory, attention, and other areas.  *See*, *generally*, ECF Nos. 40, 42.  Defendant and plaintiffs also each retained accident reconstruction experts: defendant's expert Vector Scientific and plaintiffs' expert Anne Stodola.

---

[1] In his Answer defendant admitted that he "caused the motor vehicle accident."  ECF No. 6 at 3, ¶¶15 and 16.  The Scheduling Order noted this admission.  ECF No. 9 at 3.  In his motion in limine defendant admitted "liability for the accident."  ECF No. 41 at 2.  But during the course of the case defendant has stated that he was waved into the traffic lane by another driver, that he proceeded slowly across the lanes of traffic, and that the vehicles struck one another.  And, as plaintiffs point out, the defendant has never expressly admitted that he was negligent or that his negligence caused Mr. Mitchell's injuries.  ECF No. 53 at 1-2.  Plaintiff is thus skeptical of the purported admission of liability.  *Id*.  The Court interprets defendant's admission to be that he admits that he was negligent; and he admits that his negligence was the cause of the accident; but he denies that the accident caused all of the injuries claimed by the plaintiffs.  If the position he wishes to take at trial is in any way different than the Court's interpretation, he must so inform plaintiffs' counsel and the Court in clear language.

In his pending *Daubert* motions defendant seeks to exclude various portions of the testimony of Drs. Rust, Elsila, and Woodcock, Ms. Shyam, and Ms. Stodola.  Plaintiffs ask the Court to exclude portions of the testimony of Vector Scientific.  The parties waived a *Daubert* hearing.  Additionally, the parties each filed various general motions *in limine* seeking to preclude reference to certain other topics and arguments, addressed below.

## *DAUBERT* MOTIONS

### I.  STANDARDS GOVERNING EXPERT TESTIMONY.

Under Rule 702 of the Federal Rules of Evidence, a qualified expert may provide opinion testimony if his specialized knowledge would assist the jury in doing its job (factfinding), and the opinions are based on sufficient facts and reliable methods properly applied to the facts.  In other words, the evidence must be both relevant and reliable.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  Expert opinions are relevant if they would "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 591.  They are reliable if, in addition to the expert's being qualified, his opinions are "scientifically valid" and based on "reasoning or methodology [that] properly can be applied to the facts in issue."  *Daubert*, 509 U.S. at 593.

The proponent of expert testimony has the burden to show that the testimony is admissible.  *U.S. v. Nacchio*, 555 F. 3d 1234, 1241 (10th Cir. 2009).  The trial court plays a "gatekeeping" role that involves an assessment of the "reasoning and methodology underlying the expert's opinion" and a determination of "whether it is scientifically valid and applicable to a particular set of facts."  *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000).  However, the trial court has discretion as to how to perform this

4

gatekeeping function.  *Id.*  It is not a role that emphasizes exclusion of expert testimony.  Judge

Kane aptly summarized the thrust of *Daubert* in interpreting and applying Rule 702:

> A key but sometimes forgotten principle of Rule 702 and *Daubert* is that Rule
> 702, both before and after *Daubert*, was intended to relax traditional barriers to
> admission of expert opinion testimony.  Accordingly, courts are in agreement that
> Rule 702 mandates a liberal standard for the admissibility of expert testimony.  As
> the Advisory Committee to the 2000 amendments to Rule 702 noted with
> apparent approval, "[a] review of the caselaw after *Daubert* shows that the
> rejection of expert testimony is the exception rather than the rule.

*Cook v. Rockwell Intern. Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (citations omitted).

However, under Rule 403 of the Federal Rules of Evidence, relevant evidence that meets

the requirements of Rule 702 may nevertheless be excluded if its probative value is substantially

outweighed by the danger of unfair prejudice, misleading the jury, causing undue delay, wasting

time, or needlessly presenting cumulative evidence.

With these principles in mind, I turn to the task of assessing the relevance, reliability,

and, ultimately, the admissibility of each of the challenged experts' testimony.

## II.   DR. RUST.

Dr. Lauren Rust is a licensed physical therapist endorsed as plaintiffs' expert in

"vestibular management and post-concussion management."  ECF No. 40 at 1-2.  She obtained a

doctorate in physical therapy in 2015, underwent a four-month rotation at an outpatient

neurologic clinic specializing in concussion management, and has practiced as a physical

therapist for almost seven years with a "focus on concussion and brain injury."  ECF No. 51 at 3.

Defendant seeks to preclude her from testifying that Mr. Mitchell's "central brain injury is

permanent."  ECF No. 40 at 6 (citing ECF 40-1 at 2).  Defendant challenges both the reliability

and the relevance of this opinion under Rule 702.  *See id.* at 7.  Defendant claims that the "sole

basis" for Dr. Rust's opinion that plaintiff has a permanent injury is "neuroplasticity changes"—

the notion (in Dr. Rust's words) that "past a year it's more difficult to gain functional

5

improvements" due to declining capacity in the brain for structural changes.  *Id*. at 7; ECF No. 40-4 at 70:1-6.  Mr. Rosenthal argues that the only conceivable evidence that a lack of neuroplasticity curtails Mr. Mitchell's hopes of recovery would be MRI imaging reflecting a decreasing rate of neuronal change over time, which Dr. Rust has not seen and admits she would be unqualified to interpret if she had.  ECF No. 40-4 at 79:1-24.  Therefore, defendant argues, her opinion on Mr. Mitchell's prognosis is "speculative at best."  ECF No. 40 at 7 (citing *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003)).

Each of these contentions is inaccurate.  Dr. Rust's opinion does not rely solely, or even primarily, on the concept of neuroplasticity.  In fact, her report does not mention neuroplasticity at all.  *See*, *generally*, ECF No. 40-1.  Dr. Rust instead stated that her opinion is based Mr. Mitchell's age, the chronicity of his condition over the preceding three years, and his "slow to minimal progress" in the clinic.  ECF No. 40-4 at 71:25-72:3.  The discussion of neuroplasticity arose in her deposition only after she was asked to provide a reason why functional improvements often plateau within a year of an injury.  *See id*. at 70:1-6.  But the statement that reduced neuroplasticity could explain limited functional improvement does not imply that Dr. Rust's opinion relies on assuming that neuroplasticity limitations are present.  Rather, she formed her opinion based on her observations and experience; then when asked, she offered neuroplasticity as a possible explanation.

Dr. Rust need not be qualified to conduct or interpret MRI imaging—or actually do so—to observe Mr. Mitchell's progress over the course of physical therapy and make predictions about his future trajectory based on her experience.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (recognizing that regardless of whether the expert bases her testimony "upon professional studies *or personal experience*," the objective of *Daubert*'s gatekeeping

requirement is merely to ensure that she "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field") (emphasis added). Therefore, Dr. Rust is qualified under Rule 702 to discuss Mr. Mitchell's prognosis.

The facts and methods used here are also sufficiently reliable. While expert opinions must be "based on facts" that enable the expert "to express a reasonably accurate conclusion as opposed to conjecture or speculation…absolute certainty is not required." *Dodge*, 328 F.3d at 1222 (citing *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir.1995)). Here, the permanence of Mr. Mitchell's injury is not amenable to prediction with absolute certainty. But Mr. Mitchell's documented "slow to minimal" response to four years of therapy and Dr. Rust's observations of plateaus among similar patients are "connected" to Dr. Rust's opinion about the likely permanence of his injury by far more than the mere "*ipse dixit* of the expert." *Cf. General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The reasoning supporting this opinion is sufficiently reliable to satisfy Rule 702's requirements.

The final question is whether this opinion testimony is helpful to the trier of fact within the meaning of Rules 702 and 403. The Rule 702 requirement that the evidence would "help the trier of fact to understand the evidence or to determine a fact in issue" goes "primarily to relevance," but also requires an adequate "fit" or "logical relation between the proffered testimony and the factual issues involved in the litigation." *Daubert*, 509 U.S. at 591; *People v. Martinez*, 74 P.3d 316, 323 (Colo. 2003) (citing *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 743, 745 & n. 13 (3d. Cir.1994). Relatedly, Rule 403 requires the Court to balance the probative value of the testimony against its potential for unduly prejudicial effect or waste of time. *See* Fed. R. Evid. 403.

Here, the opinion testimony about Mr. Mitchell's prognosis is logically related to the contested factual issue of damages. Because it relies on data observed from Mr. Mitchell and other concussion patients, the opinion "fits" neatly with the factual question of what damages were sustained as a result of the accident. There is no indication that this testimony will cause undue or unfair prejudice to Mr. Rosenthal.

Because Dr. Rust is qualified to use her observations and clinical experience to predict patients' responses to treatment, and because that prediction is relevant here to the nature and extent of Mr. Mitchell's injuries, this opinion testimony is permissible under Rule 702; and Defendant's motion to exclude it under Rules 702 and 403 is denied.

## III.   MS. SHYAM.

Ms. Ramya Shyam is a speech-language pathologist who specializes in "cognitive-linguistic therapy." ECF No. 40 at 2. She has assessed and treated patients with traumatic brain injuries for over ten years, focusing exclusively on concussion patients since 2015. *See* ECF No. 51 at 5. Defendant seeks to preclude her from testifying that the accident with Mr. Rosenthal caused Mr. Mitchell's brain injury and his present cognitive communication impairment, that Mr. Mitchell's vocational prospects are limited by his cognitive impairments, and that Mr. Mitchell's traumatic brain injury places him at increased risk of dementia. ECF No. 40 at 1.

### A.  Opinion regarding diagnosis of traumatic brain injury, alleged cause, and severity of accident.

In her report, Ms. Shyam notes that Mr. Mitchell "sustained a traumatic brain injury with a central vestibular component as well as significant visual issues" and concludes that "the injuries [she had] been treating Mr. Mitchell for were caused by the subject crash that occurred in June of 2017." *See* ECF No. 40-2 at 1. Defendant argues that Ms. Shyam is "not qualified to opine on the existence of a brain injury or its cause" because "she is not a doctor or engineer,"

and that she engaged in "unqualified speculation" in inferring that the accident was severe enough to cause the diagnosed injuries.  ECF No. 40 at 8-9.  Specifically, defendant takes issue with the fact that Ms. Shyam "refers to the 'traumatic brain injury' throughout her report" when "she did not diagnose plaintiff with a brain injury and could not; that diagnosis is based on other experts' reports and incorporated into her own."  *Id*. at 9.

As an initial matter, this objection from defendant seems to undermine his own proffered expert testimony.  Defendant argues that the similar phrase "Trauma Induced Neurological Disorder (TIND)" is merely a general descriptive term, not a medical diagnosis, and therefore that his expert—despite lacking any sort of medical credentials—may not only refer to TIND throughout its report, but also assert that Mr. Mitchell has TIND.  If defendant believes his engineer may refer to "Trauma Induced Neurological Disorder" without offending Rule 702, it is incongruous to object to Ms. Shyam's referring to "traumatic brain injury"—a term comparable in meaning with even less of the patina of medical authority suggested by the acronym.

Moreover, differentiating between description and diagnosis is a distinction without a difference in this context.  It is not contested that Mr. Mitchell was diagnosed with traumatic brain injury by appropriately qualified medical doctors.  *See* ECF No. 40-5 at 69:20-25; ECF No. 40 at 9.  The only issue is whether Ms. Shyam may refer to that diagnosis in discussing Mr. Mitchell's present cognitive-linguistic deficits without offending the edicts of Rule 702.

The answer is that she may.  Ms. Shyam is qualified by licensing, experience, and ongoing education to diagnose and treat speech-language pathologies related to brain injury.  *See* ECF No. 51 at 5.  Relatedly, she may—and did—review Mr. Mitchell's medical records, conduct clinical interviews, and perform a battery of tests to identify "cognitive communication

impairment" and "concomitant issues such as visual deficits."  ECF No. 40-2 at 1.  She is qualified to testify that her examination revealed those enumerated deficits.

Ms. Shyam's conclusion that the observed deficits were "secondary to [a] traumatic brain injury" sustained in the accident is "grounded in the methods and procedures of science" and supported by "what was known" from her observations and her interpretation of the medical record, making it sufficiently reliable to satisfy Rule 702.  *Dodge*, 328 F.3d at 1222 (quoting *Daubert*, 509 U.S. at 590).  In addition to her personal knowledge from observing, testing, and interviewing Mr. Mitchell, she incorporated her knowledge from the medical records of Mr. Mitchell's diagnoses of concussion and mild neurocognitive disorder after the accident.  And it was appropriate for her to do so.  *See Bullock v. Daimler Trucks N. Am.*, LLC, No. 08-CV-00491-PAB-MEH, 2010 WL 4135330, at *2 (D. Colo. Sept. 30, 2010) (quoting Fed. R. Evid. 703, which permits experts to rely upon facts "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" when allowing one expert to rely on facts set forth in another expert's report).  Documents from other treating providers regarding the etiology of an injury and the history of its treatment are "facts of a type reasonably relied upon" by other specialists and are therefore a permissible basis for the opinion here.

For example, Ms. Shyam's interpretation of Mr. Mitchell's condition and appropriate treatment would likely have differed substantially if he had presented with a spontaneously arising disturbance in his memory and cognition without any attributable cause, versus the reality in which he presented after being involved in a car-scooter accident, hitting his un-helmeted head on pavement, and sustaining a concussion.  To note the etiology of the diagnoses she rendered is neither inappropriate nor unreliable, and to base her opinions on a holistic review of the medical records rather than cabining information to her firsthand observations likely *enhances* rather than

detracts from the reliability of those opinions.  Because it is reliable, her opinion attributing the cognitive deficits she identified to the brain injury sustained in the accident is admissible.

Regarding the effort to preclude Ms. Shyam from testifying about the severity of the accident, defendant misstates the nature of this testimony.  He suggests that Ms. Shyam will justify her opinion that the accident caused the present deficits by arguing that the accident was severe enough to cause such injuries.  *See* ECF No. 40 at 9 (quoting Shyam's deposition testimony that she "think[s] it would be very unlikely that someone would fall off of a motorcycle and hit their head and not have any issues afterward").  This would indeed be circular and not grounded in sufficient data or facts to satisfy Rule 702.  *See Dodge*, 328 F.3d at 1222. Ms. Shyam has no information about the "forces or speeds, how far Mr. Mitchell may have fallen or traveled" in the accident; therefore, she has insufficient basis to testify that the accident was or was not "severe."  ECF No. 40-5 at 100:10-13.

However, plaintiffs seem to have no intention of eliciting such testimony.  Ms. Shyam herself disclaims the very inference to which defendant objects.  *See id*. at 99:1-5 ("[T]he idea that magnitude of impact is a predictor of outcome severity is something that has been debunked essentially.").  Furthermore, as discussed above, Ms. Shyam's opinion that the primary source of Mr. Mitchell's cognitive impairments is traumatic brain injury is supported by her observations and the history of the complaint—not on any speculation about the biomechanics of the accident. *Id*. at 100:10-13.

To the extent that defendant seeks to preclude Ms. Shyam from extrapolating back from the fact that Mr. Mitchell was diagnosed with a traumatic brain injury to an opinion that the accident was sufficiently severe to cause such an injury (however unpersuasive and unlikely this argument is), his motion is granted.  To the extent that he seeks to bar testimony that the

cognitive impairments Ms. Shyam observed are secondary to traumatic brain injury and attributable to the accident, his motion is denied.

### B. Opinion regarding vocational limitations.

Defendant also moves to preclude Ms. Shyam from testifying that she does not believe plaintiff will be "capable of working competitively as an architect or design-build contractor," and that plaintiff's "earning capacity will be limited for the remainder of his life." ECF No. 40-2 at 2-3. According to Ms. Shyam, this opinion is based on plaintiff's "low test scores in areas of working memory and attention," his self-reported symptoms, and interviews with his employer and co-workers who note his inefficiency—describing that he "makes mistakes," often "has to redo things," and is "always having to cross-reference things." 40-5 at 81:9-13, 77:23-25. Ms. Shyam's opinion that these limitations will persist indefinitely is based on their course since the accident—she notes that when attentional issues "are that severe for that long…they typically do persist." ECF No. 40-5 at 98:5-10.

A patient's cognitive-linguistic symptoms, treatment, and prognosis are squarely within the realm of a cognitive-linguistic pathologist's expertise. Therefore, Ms. Shyam is qualified to testify about Mr. Mitchell's reported and observed symptoms, her opinion that those symptoms will be chronic, her treatment and functional recommendations, and plaintiff's reportedly limited success in implementing those strategies. *See Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991) (an expert is qualified to render opinions only "within the reasonable confines of [her] subject area" rather than "on an entirely different field or discipline").

Under the same analysis as in section III.A, *supra*, the methodology here (gathering data from medical records, clinical interviewing, and standardized testing and then forming a working diagnosis and conclusions about the practical impacts to plaintiff's life) is sufficiently reliable.

Ms. Shyam's report does have instances of possible internal inconsistency.  *See*, *e.g.*, ECF 40-2 at 3 (stating that "the deficits [she] described are likely permanent" but also that she believes a 12-week auditory program "will help [plaintiff] and allow him to progress further").  But these possible inconsistencies are best addressed on cross-examination and go to the weight of the evidence, not its admissibility.

By contrast, Ms. Shyam does not purport to be, and is not qualified as, a vocational expert capable of opining on Mr. Mitchell's employment prospects or earning capacity.  The court in *Rowe v. DPI Specialty Foods, Inc.* properly precluded an economics and damages expert from offering vocational opinions on the plaintiff's "minimal level of effort" and "lackluster networking" in his job search and on the characteristics that "employers often look for" in applications, because review of agency data and hiring information did not provide sufficient knowledge, skill, or expertise to qualify the expert to render such opinions.  727 F. App'x 488, 501 n. 12 (10th Cir. 2018) (unpublished).  Likewise, Ms. Shyam may testify as an expert on speech-language pathology, but she may not speculate about what level of productivity a given employer is "probably going to expect" or whether plaintiff's abilities render him "competitive" with other architects and design-build contractors.  *See* ECF No. 40-5 at 77:23-78:17.  Even if she had data about hiring trends and the productivity of other applicants—which it seems she does not—access to such information did not transform the economics expert in *Rowe* into a vocational expert and does not so transform Ms. Shyam here.  *See* 727 F. App'x at 501.

Because Ms. Shyam is not qualified to testify on Mr. Mitchell's employment prospects and earning capacity, I need not address the reliability of her opinions on those matters.  In sum, defendant's motion regarding Ms. Shyam's opinion on plaintiff's vocational capacities is granted to the extent that she may not testify about what employers in the field expect or what plaintiff's

earning capacity may be.  Ms. Shyam may testify about her observations, plaintiff's self-reported limitations, and the impacts of those deficits on his ability to perform his activities.

### C.  Opinion regarding risk of cognitive decline.

Finally, defendant seeks to preclude Ms. Shyam from testifying that Mr. Mitchell is at an increased risk of cognitive decline because of his age at the time of injury.  In her deposition, Ms. Shyam noted that her opinion was based on scientific literature associating concussion at older age with an increased risk of dementia, although she was not able to identify specific studies or the amount of increased risk.  *See* ECF No. 40-5 at 61:1-62:10.  Ms. Shyam in turn became aware of this medical literature not for the purposes of this litigation but because it is relevant to her clinical management.  *See id*. at 61:24-62:2 (noting that "a number of patients ask [Ms. Shyam]: "Am I at a greater risk for dementia or Alzheimer's due to this injury?" and that she responds with information from the body of literature associating head trauma with increased risk of dementia).

The factfinder might conclude that Ms. Shyam's testimony here merits relatively little weight if she is unable to cite her sources or provide any information about the studies involved.  Still, this opinion is grounded in her "knowledge and experience" in clinical practice rather than in mere speculation, so the methodology—the focus of the court's reliability inquiry—is sufficient.  *See Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").  She need not articulate the precise amount of increased risk of cognitive decline in order to opine that there is a concern for such decline.

Moreover, the opinion is relevant to the nature and extent of plaintiff's injuries, which goes to the contested issues of causation and damages, so it is both helpful to the factfinder under

Rule 702 and of significant probative value under Rule 403 (although less precision in her knowledge of the magnitude of the risk limits the helpfulness of the testimony).  The mere fact that another expert is also qualified to testify about the risk of cognitive decline does not create a danger of prejudice or delay so great as to substantially outweigh the probative value of the evidence.  *See* Fed. R. Evid. 403.  Therefore, the testimony is admissible under both Rules 702 and 403.  Defendant's motion to exclude testimony from Ms. Shyam about the risk of cognitive decline is denied.

## IV.   DR. ELSILA.

Dr. Amy Elsila is a developmental optometrist.  She has been practicing for "about eight years" and has "developed a brain injury specialty in her optometry practice through working at a referral center" for patients who may have sustained brain injuries.  ECF No. 51 at 8.  She estimates that she sees five patients per week who have suffered a concussion.  *Id*.  Defendant seeks to preclude her from testifying that Mr. Mitchell's work is impaired by his visual symptoms, and that the accident caused a brain injury which in turn caused these visual disturbances.

### A.  Opinion regarding vocational limitations.

Dr. Elsila's deposition testimony that she "would think that an employer would not agree" that Mr. Mitchell's 80 percent reading comprehension score was a "passing score"— like Ms. Shyam's testimony about what level of productivity an employer "is probably going to expect"—is not based on information within her expertise, and seemingly is not based on any information at all.  *See Wheeler*, 935 F.2d at 1100.  This opinion is inadmissible.

Regarding her other statements related to Mr. Mitchell's employment, defendant claims that Dr. Elsila "concluded plaintiff cannot succeed as an architect anymore because he

'skimmed' while reading on a test she administered." ECF No. 40 at 13. This mischaracterizes her testimony. In fact, Dr. Elsila testified that she believed the reading test indicates "more of a tracking issue…rather than [that] he was skimming the paragraph," and she concluded not that Mr. Mitchell's deficits render him utterly incapable of success but rather that they "impair" and "negatively affect" his work and recreational activities. ECF No. 40-6 at 88:16-19, ECF No. 40-3 at 3. These opinions—that the test results reveal deficits in plaintiff's reading mechanics and performance, and that those deficits have had practical impacts on plaintiff's work and recreational activities—are squarely within the scope of her expertise (administering optometric tests, rendering optometric diagnoses, and directing treatment).

The methodology used to reach this conclusion is also sufficiently reliable. Medical providers commonly consider patient's self-reports to inform diagnosis and treatment. *See*, *e.g.*, *Doty v. City & Cnty. of Broomfield*, No. 12-CV-01340-PAB-MJW, 2013 WL 5510644, at *5 (D. Colo. Oct. 4, 2013) (the court noting and not disputing the plaintiff's assertion that "any doctor would likely…consider the self-report of a patient"). It is true that when a medical expert testifies to a plaintiff's self-reported symptoms and limitations, there may be a risk of cloaking the self-report in the garb of objectivity. Therefore, an expert may not merely "regurgitate facts" and then reach "conclusory opinions" based *only* on those facts, but rather, must provide supporting facts or otherwise explain the methodology used to derive the opinion. *See id*. (citing *In re Trasylol Prods. Liability Litigation*, 709 F.Supp.2d 1323, 1346 (S.D. Fla. 2010)).

Here, results of clinical testing and Dr. Elsila's observations—the validity of which neither party contests—provide an adequate basis for the conclusion that Mr. Mitchell has certain optometric limitations. The opinion about the impact of Mr. Mitchell's optometric conditions on his ability to perform certain tasks is proper under Rule 702 and is significantly probative of both

causation and damages under Rule 403.  The additional inferential step that, because several of those tasks are inherent to work as an architect, plaintiff's ability to work as an architect is impaired is a direct application of logic.  While that logical step does not necessarily require expert credentials to articulate, it does not invade the province of the factfinder for the expert to clarify the full implications that logically follow from her permissible testimony.  Therefore, the probative value of this testimony is not substantially outweighed by the risk of unfair prejudice or waste of time, and the testimony is likewise admissible under Rule 403.

Defendant's motion is granted to the extent that Dr. Elsila may not offer an ultimate opinion about whether plaintiff is able to work as an architect at all.  Otherwise, the motion is denied: Dr. Elsila is permitted to testify about plaintiff's visual testing, the optometric diagnoses and differentiation from pre-existing conditions, and the practical effects of plaintiff's visual deficits on his activities.

### B.  Opinion regarding causation.

Defendant objects to Dr. Elsila's testimony "about medical diagnoses or causation of a brain injury."  *See* ECF No. 40 at 15.  Specifically, he argues that she is unqualified to opine that the five optometric conditions she diagnosed resulted from the car accident and associated brain injury, because she "cannot make medical diagnoses" but rather only "clinical diagnoses of ocular diseases."  *Id*.  He also argues that her opinion is unreliable because it is "speculation without qualification or basis."  *Id*.  Each of these arguments is without merit.

No one disputes that Dr. Elsila is qualified to perform optometric testing and render the five diagnoses in her report.  *See* ECF No. 40-3 at 2-3.  The issue is whether she may opine that those optometric disturbances are associated with traumatic brain injury.  Like Ms. Shyam's testimony that plaintiff's cognitive-linguistic pathologies are secondary to traumatic brain injury

sustained in the accident, Dr. Elsila's testimony here is not a freestanding diagnosis of traumatic brain injury but rather an indication of the etiology of the conditions she diagnosed. Determining whether a diagnosis is secondary to another disorder is a common practice—used for clarity of communication among providers and coordination of care—and falls within the scope of her expertise.

Defendant's motion to exclude Dr. Elsila's testimony that the optometric disturbances are secondary to brain injury and attributable to the car accident is denied.

## V.   DR. WOODCOCK.

Dr. Jonathan Woodcock is a clinical associate professor of neurology in the School of Medicine at the University of Colorado at Denver. ECF No. 52-1 at 1. He is board-certified in internal medicine, neurology, psychiatry, and behavioral neurology and neuropsychiatry; and he has an extensive teaching and publication record over the past more than 20 years on topics related to brain and head injuries and treatment. *See id*. Defendant seeks to preclude his statement that the collision involved "substantial energy," his opinion that Mr. Mitchell's symptoms impair his ability to work, and his rebuttal of several of the opinions of defense experts Dr. Kenneally and Dr. Lipkin.

### A.  Opinion regarding severity of accident.

Defendant argues (1) that Dr. Woodcock is unqualified to opine on the forces transmitted to plaintiff's head, brain, and body during the accident, and (2) that the reasoning supporting his conclusion that those forces were substantial is unreliable.

Regarding Dr. Woodcock's qualifications, he need not be an engineer or physicist to opine, as a doctor, that rib fractures and contusions typically would not occur spontaneously without some significant impact to the site. *See* ECF No. 42-1 at 2 (Dr. Woodcock in his report

finding that "the collision involved substantial energy…sufficient to cause objective rib fractures with pneumothorax and multiple contusions").  Dr. Woodcock is qualified to use his knowledge about the typical rate at which ribs fracture, elbows and hips incur contusions, or lungs collapse spontaneously versus with acute trauma (among individuals of Mr. Mitchell's age and health status) to conclude that Mr. Mitchell's bodily injuries here suggest an impact occurred.

However, the fact that plaintiff sustained substantial impacts to his torso and limbs does not necessarily suggest that he sustained equivalent impacts to his head.  There were two separate impacts in this accident—one in which Mr. Rosenthal's Cadillac struck Mr. Mitchell on his scooter, and one in which Mr. Mitchell fell and struck the ground.  Dr. Woodcock's deposition testimony that the collision "involved substantial energy which was transmitted to Mr. Mitchell's head, brain, and body through the mechanism of deceleration as he contacted the pavement" assumes that the same magnitude of force was placed on Mr. Mitchell's body and head.  *Id*.  It is not clear whether he believes that the impact causing the bodily injuries was the collision itself or the "deceleration as [plaintiff] contacted the pavement."  *See id*. (Dr. Woodcock extrapolating from the extent of bodily injuries that "this level of energy" would "certainly be sufficient to cause a brain injury through deceleration as well" without clarifying whether "this level of energy" referred to the impact with the car or with the pavement).

Regardless, Dr. Woodcock has no apparent basis to believe that the same impact that caused the broken ribs and contusions caused the hematoma and concussion, or to attribute any given injury to the initial collision versus the subsequent fall.  If Dr. Woodcock's analysis assumes that the magnitude of the force placed on Mr. Mitchell in the initial collision with Mr. Rosenthal's car was equivalent to the magnitude of force placed on his head when it struck the ground, that opinion is unreliable because it equates the forces in the two collisions.  If Dr.

Woodcock's analysis assumes that the torso injuries and the head injury both occurred when plaintiff struck the pavement, and that an impact sufficient to cause rib fractures and contusion would also be sufficient to cause head injury, that opinion would be unreliable because it assumes that the torso and/or head sustained no independent impacts in the initial collision (which he does not have information to support).

If Dr. Woodcock merely meant that *any* fall from a scooter onto pavement would likely cause sufficient force through deceleration to cause the diagnosed head injuries, then the discussion comparing the forces sufficient to cause rib fractures and contusions versus head injuries would be unnecessary. Therefore, it seems that Dr. Woodcock's reasoning relies on an assumption either that the torso and head injuries occurred in the same impact or that the two impacts were equivalent. Each of those logical paths involves an "unjustified extrapolation from an accepted premise to an unfounded conclusion," and therefore the opinion is inadmissible under Rule 702. *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1224 (D. Colo. 2008).

Defendant's motion to prohibit Dr. Woodcock from opining that the forces placed on plaintiff's head and body were equivalent is granted. However, Dr. Woodcock may give his qualitative opinion of the forces placed on plaintiff's torso based on the injuries observed, and he may describe how the deceleration from falling onto pavement from a moving scooter could cause a head injury. To that extent, defendant's motion is denied.

### B. Opinion regarding vocational limitations.

Defendant objects to Dr. Woodcock's testifying that plaintiff's "symptoms and impairments have greatly impacted his vocational abilities," because Dr. Woodcock "is not qualified to make determinations about what jobs a person may be able to hold or what defines success in a job." ECF No. 42 at 9. However, there is no indication that the former statement

20

(Dr. Woodcock's actual conclusion) will involve any of the latter assertions to which defendant objects.  *See* ECF No. 52 at 3 (noting that Dr. Woodcock at no point stated that plaintiff could not work as an architect; instead, he concluded in his report that it "is not yet clear" whether Mr. Mitchell's current employment efforts in "architecture – construction" will be successful).

Under the same analysis as above in sections III.B and IV.A, Dr. Woodcock is qualified to testify to Mr. Mitchell's symptoms and deficits and their practical impacts on his ability to work.  This opinion is grounded in the physician's observations, patient interviews, and review of the medical records—sufficiently "'good grounds,' based on what is known," to support the conclusion and to satisfy Rule 702.  *Dodge*, 328 F.3d at 1222.  Defendant's motion to preclude this opinion under Rule 702 is denied.

Defendant also argues that this opinion is cumulative and should be independently excluded under Rule 403.  However, in order to remain "within the reasonable confines of [his or her] subject area"—as defendant emphasizes—each of plaintiff's experts (Rust, Shyam, Elsila, Woodcock, etc.) must testify to the vocational impact of plaintiff's symptoms and diagnoses within their respective fields of expertise.  *See Wheeler*, 935 F.2d at 1100.  Therefore, while there may be some overlap in the implications of certain symptoms, the testimony of each expert is distinct.  There is no basis to exclude Dr. Woodcock's testimony on the basis that it is duplicative of that of other experts, and defendant's motion under Rule 403 to exclude this opinion is denied.

### C.  Opinion rebutting testimony of defense experts.

Finally, defendant seeks to preclude Dr. Woodcock from rebutting the testimony of defense experts Suzanne Kenneally, PsyD, and Alan Lipkin, MD.  *See* ECF No. 42.  With respect to Dr. Kenneally, defendant argues that Dr. Woodcock—board-certified in neurology and

psychiatry, among others—cannot give rebuttal opinions because those opinions are "neuropsychological in nature, not neurological or psychiatric." *See* ECF No. 56 at 4.

This argument is without merit. Defendant identifies no caselaw suggesting that a rebuttal expert's certifications must exactly mirror those of the expert whose opinions are being contested. To recognize such an arid formalism would contravene the flexible and functional analysis contemplated in *Daubert*. *See Cook*, 580 F. Supp. 2d at 1082. Rather, the inquiry is whether the expert's credentials and experience adequately inform a given opinion. *See United States v. Nacchio*, 555 F.3d 1234, 1244 (10th Cir. 2009).

Here, Dr. Woodcock's specialties in neurology and psychiatry with sub-specialties in behavioral neurology and neuropsychiatry are more than sufficient to provide a basis for him to respond, for example, to Dr. Kenneally's attribution of plaintiff's symptoms to depression, her citation to variability in the test results to purportedly rule out traumatic brain injury, her apparent mischaracterization of the medical literature on the duration of symptoms post-concussion, and her use of the diagnosis of persistent depressive disorder to reject the possibility of neurological impairment. *See* ECF No. 52-4 at 3-5. Dr. Woodcock's rebuttal testimony will be uniquely helpful to the jury in assessing the credibility of Dr. Kenneally's opinions, and there is no risk of undue delay or waste of time.

Likewise, Dr. Woodcock's qualifications provide sufficient basis for his rebuttal to Dr. Lipkin. The opinions at issue there are Dr. Woodcock's statements that traumatic brain injury often produces "problems in sleep" associated with physical or psychological changes, and that previously healthy patients with high "physical reserves" may fall within the normal range on tests of vestibular and motor performance while still having sustained significant functional decrements from their baseline abilities. ECF No. 52-4 at 6. Although Dr. Woodcock is not an

Ear, Nose, and Throat specialist, and the jury might place greater weight on Dr. Lipkin's testimony here based on his specialized expertise, Dr. Woodcock's knowledge of brain injury symptoms and the course of rehabilitation nevertheless adequately informs his opinion. *See*, *generally*, ECF No. 52-2. His opinion identifying instances in which Dr. Lipkin's analysis might be limited or incomplete would be helpful to the jury, and his testimony is not unfairly prejudicial or cumulative. Therefore, defendant's motion to exclude Dr. Woodcock's rebuttal testimony under Rules 702 and 403 is denied.

## VI.    MS. STODOLA.

Anne Stodola is a mechanical engineer endorsed by plaintiff as an accident reconstruction expert. ECF No. 41-1 at 1. She obtained a master's degree in Mechanical Engineering in 1994, has completed additional training in accident reconstruction, and has investigated and reconstructed more than 1,500 motor vehicle crashes during her career. *Id*. Defendant seeks to preclude her from offering nine of the ten "conclusions" from her primary report. *See* ECF No. 41-1 at 10.

These ten "conclusions" are as follows:

1. Mr. Rosenthal was northbound and intended to turn left to the west from the driveway on the south side of Main Street on June 27, 2017 at approximately 12:16 p.m. in Aspen, Colorado.
2. Eastbound traffic was heavy.
3. A driver in the eastbound right lane stopped and left a gap to accommodate the Cadillac.
4. Mr. Rosenthal stated that he was waved through.
5. Mr. Mitchell was riding his Honda Scooter in the eastbound left lane of Main Street at a speed below the posted speed limit of 25 mph and had the right of way approaching the driveway.
6. Mr. Rosenthal failed to maintain a proper lookout and failed to yield the right of way to Mr. Mitchell as he drove across the left eastbound lane.
7. The front of the Cadillac struck the right side of the scooter and Mr. Mitchell.
8. The scooter sustained a lateral delta V of approximately 8.5 mph.
9. This is analogous to having almost 1,000 lbs. placed on Mr. Mitchell's body.
10. Mr. Mitchell was ejected from the scooter and struck the ground at approximately 13 mph, sustaining a head injury.

*Id*.  Defendant moves to exclude all but opinion 8.  *See* ECF No. 41 at 8-12.

### A.  Opinions 1-5 and 7.

The facts set forth in opinions 1-5 and 7 are relevant to assessing the credibility of Ms. Stodola's calculations.  The speed and direction of the parties at the time of the collision, which are premises in Ms. Stodola's calculations of the forces involved in impact, are dictated in part by traffic conditions (*see* opinion 2) and interactions with other drivers (*see* opinion 4).

While these facts may be cumulative with the testimony of the parties and other documents, the time required to enumerate them does not create a danger of delay and waste of time so great as to "substantially outweigh" their probative value in assessing the validity of Ms. Stodola's assumptions.  Fed. R. Evid. 403.

I will note that these facts are more accurately labeled underlying facts or assumptions, rather than "opinions" or "conclusions," and plaintiff should refrain from asserting or implying that Ms. Stodola has used her engineering expertise to test or otherwise confirm those assumptions.

### B.  Opinion 6.

Ms. Stodola's conclusion that Mr. Rosenthal "failed to maintain a proper lookout" and failed to yield the right of way is not relevant to her calculation of the forces involved in the accident or the jury's assessment of the accuracy of her assumptions in so doing.  It appears to serve only to remind the factfinder that the defendant is at fault for this accident, which— defendant has repeatedly maintained—is not a contested issue.  *See*, *e.g.*, ECF No. 41 at 8. While it is not an inaccurate statement of the law and might fairly be considered colloquial or commonsensical rather than legal (contrary to defendant's arguments), it is unnecessary to Ms.

Stodola's calculations.  The risk of unfair prejudice associated with that statement substantially

outweighs its (nonexistent) probative value, so that opinion is excluded.  Fed. R. Evid. 403.

### C.  Opinion 8.

The parties do not dispute that opinion 8 is admissible.

### D.  Opinion 9.

Defendant objects to the analogy in opinion 9, arguing that Ms. Stodola will mislead and

confuse the jury by translating a lateral delta V value into pounds, and by referring to 968 pounds

as "almost 1,000" pounds.  ECF No. 55 at 8.  Defendant acknowledges that she "may properly

use [the number 968 pounds]" to explain the forces involved" but objects to her "rounding up by

32 pounds."  *Id*.  Illustrating the delta V finding with the image of the equivalent weight that

would be placed on plaintiff by a wall pressing against him is helpful in conveying that finding

to lay jurors.  It is doubtful that a jury will be confused by Ms. Stodola's describing 968 pounds

as "almost 1000," and defendant will have the opportunity on cross-examination to elicit the

precise value, relieving any remaining risk of confusion.  Therefore, opinion 9 is admissible.

### E.  Opinion 10.

Like opinion 8, opinion 10 provides the result of Ms. Stodola's calculation regarding the

speed at which plaintiff hit the ground.  This aspect of the opinion is unobjectionable.  Defendant

finds problematic only the last clause which states that plaintiff fell, "sustaining a head injury."

*See* ECF No. 55 at 9 (arguing that it is inappropriate to have an engineer testify about a medical

diagnosis, even if the source of that information the medical record).  Whether the fall resulted in

a head injury is not relevant to the bases or accuracy of Ms. Stodola's calculation of the speed at

which defendant hit the ground, and ample other providers will testify that Mr. Mitchell

sustained a head injury from the fall.  The conclusion merely adopts the opinion of providers

who are already testifying, making it unnecessarily cumulative.  Defendant's motion is granted

to the extent that she may not testify that the fall caused head injury.  The motion is otherwise

denied.

## VII.   VECTOR SCIENTIFIC, INC.

Vector Scientific, Inc. ("Vector") is made up of biomechanical engineer J. Michio Clark,

PhD, and mechanical engineer Zachariah Weimer, MS, PE.  Mr. Weimer is an accredited traffic

accident reconstructionist and has worked in accident investigation and reconstruction since

2009.  ECF No. 49 at 4.  Dr. Clark has degrees in kinesiology and biomechanics and a PhD in

mechanical engineering and biomechanics.  *Id.*  Mr. Weimer is anticipated to testify about the

speeds of the vehicles during the accident, while Dr. Clark is anticipated to testify about the

"forces that acted upon Mitchell and the likely effects of those forces."  ECF No. 49 at 2.

Plaintiffs challenge only Dr. Clark's component of the testimony, although the motion

refers to the collective opinions of "Vector."  *See* ECF No. 44 at 2.  Plaintiffs move under Rule

702 to exclude Vector's calculation of the cumulative brain trauma exposure (CBTE) Mr.

Mitchell underwent during the collision and its conclusion that the calculated CBTE value was

not consistent with "confirmed cases" of "trauma induced neurological disorder"—a phrase

Vector seems to have invented to describe the neurological sequelae of a head injury.

### A.  Calculation of plaintiff's cumulative brain trauma exposure (CBTE).

Plaintiffs do not dispute that a biomechanical engineer and a mechanical engineer are

qualified to make calculations of the speeds and forces involved in the collision.  They challenge

only the reliability of the conclusion that "cumulative brain trauma exposure (CBTE) for 4-11

mph drop tests of an unhelmeted anthropometric test device (ATD) headform onto a stiff surface

simulating a fall was calculated to be 4.0 – 5.0" [units omitted in report].  ECF No. 44 at 2.

As an initial matter, plaintiffs' objection to Vector's use of "irrelevant literature" on concussions in the context of competitive helmeted sports has no bearing on the analysis here. That literature was used only to extrapolate the point at which the collision lies on the "specific concussion risk curve," and plaintiffs do not challenge Vector's conclusion from that analysis (that concussion could not be ruled out). *Id*. Therefore, I will not address the validity of the "specific concussion risk curve" or conclusions derived from it.

Plaintiffs claim also that the pedestrian accident reconstruction models that Vector used to calculate Mr. Mitchell's likely ground impact speed are in fact inappropriate because he "was not a pedestrian but was riding a Honda scooter." *Id*. at 9. Then, plaintiffs argue, because Vector's calculation of plaintiff's CBTE relies on this calculated ground impact velocity, the CBTE value is likewise unreliable. *See id*. But beyond the conclusory statement that the pedestrian reconstruction model is "inherently unreliable" to a pedestrian on a scooter, plaintiffs identify no reason that Vector would not be able to adjust the assumptions in the model or interpret its findings to account for the difference between the impact on a human struck by a car versus that of a human mounted on a scooter struck by a car. *Id*.

Vector addresses this concern in its report. It notes that so long as the "interaction between the human and the car is full"—i.e., that the car strikes the person's body directly—the pedestrian model applies to humans mounted on bicycles, scooters, and other vehicles. *See* ECF No. 49 at 9 (citing generally Broker, J.P. and P.F. Hill, *Bicycle Accidents: biomechanical, engineering, and legal aspects*. 2006: Lawyers and Judges Publishing). While this general citation to an entire textbook on "legal aspects" of bicycle accidents is not entirely persuasive, I lack any scientific basis to believe that Vector's contention is inaccurate. The range of error introduced by use of the pedestrian model for a pedestrian mounted on a scooter and the reasons

Vector did not choose the model used by plaintiffs' accident reconstruction expert are appropriate topics for cross-examination, not reasons to bar the testimony altogether.

At the very least, the pedestrian model would provide an approximation of the speed at which Mr. Mitchell struck the ground.  This information is relevant to the extent and nature of the forces on him (ultimately relevant to the contested issues of causation and damages), is not unfairly prejudicial, and is beyond the capacities of a lay juror to calculate.  Therefore, this opinion satisfies the requirements of Rules 403 and 702.  Plaintiffs' motion to exclude this opinion is denied.

### B. Conclusion that plaintiff's medical records reflect trauma induced neurological disorder (TIND) inconsistent with the accident dynamics.

Plaintiffs also seek to exclude Vector's testimony that Mr. Mitchell's medical records reflect "trauma induced neurological disorder" (TIND), and that the accident dynamics are not consistent with TIND.  They argue that TIND is a medical diagnosis that appears nowhere in the medical records, and that the two engineers are unqualified to offer these opinions.  ECF No. 44 at 2.  Defendant maintains that TIND is "an umbrella term to describe a disorder to the nervous system secondary to physical injury," not a medical diagnosis.  ECF No. 42 at 7.  But defendant's own argument is belied by his objection to plaintiffs' expert Ramya Shyam's using the term "traumatic brain injury"—which he argues constitutes an unqualified medical diagnosis. *See* ECF No. 49 at 6.  If "traumatic brain injury" is a medical diagnosis, "trauma induced neurological disorder" would seem equally or even more diagnostic given its characterization as a "disorder" rather than a mere "injury."

Furthermore, defendant and Vector refer repeatedly to "confirmed cases" or "confirmed diagnoses" of TIND.  *See*, *e.g.*, ECF No. 49-1 at 8, 11.  It is unclear to me how one could "confirm" a "case" of TIND without diagnosing the individual with neurological injury.  Even if

28

one could, it is illogical for defendant to argue simultaneously that National Football League data should be considered the definitive encapsulation of possible TIND mechanisms because of its reference to "confirmed cases," while also maintaining that defendant's experts may opine that Mr. Mitchell has TIND because it does not require diagnosis.  Through this confusing interchangeability of terms and the implication that TIND is a medically recognized disorder, Vector in effect renders a diagnosis that appears neither in the medical records nor in any of the reports offered by plaintiff's experts.  *Cf.* Section III.A, *supra* (permitting Ramya Shyam to assume that plaintiff was diagnosed with a traumatic brain injury in rendering her secondary cognitive-linguistic diagnoses, because the traumatic brain injury was diagnosed by qualified physicians and documented in plaintiff's medical records).

Even if TIND were encapsulated in the diagnosis of traumatic brain injury, such that the Vector experts could permissibly rely on that information to conduct further analysis, their methodology is unreliable.  Defendant's justification that plaintiffs' experts Anne Stodola and Michael Freeman "agree with [Vector's] conclusions," even if true, has no bearing on the reliability of the methods used and whether those methods were applied appropriately to the facts of this case.  *Cf.* ECF No. 49 at 2.  The inquiry is whether the data adequately fits the factual scenario here, and whether the analysis appropriately applied scientific principles to reach its conclusion.

The thrust of Vector's contention is that (1) Mr. Mitchell's medical records reflect TIND, (2) there are two possible mechanisms that produce TIND: a single moderate to severe trauma or repetitive microtrauma, (3) Mr. Mitchell's diagnosis was "mild concussion," so he cannot have sustained TIND through the mechanism of a moderate to severe trauma, (4) the forces in this accident are lower than the cumulative forces associated with NFL players diagnosed with

neurological disorders, and (5) therefore, the accident dynamics are "inconsistent with TIND" (i.e., the accident could not have caused Mr. Mitchell's neurological disorder). *See id*. at 6. The logical and scientific flaws in this argument are numerous.

First, as discussed above, no qualified professional has determined that Mr. Mitchell has TIND. If, as defendant argues, the diagnosis of TIND is implied by the diagnosis of traumatic brain injury, then this premise is not unfounded but merely confusing. That unhelpfulness alone would be grounds to render it inadmissible under Rule 702. But even granting the shaky premise that Mr. Mitchell has TIND does not salvage the remainder of the opinion.

Second, I will note the oddity of attempting to construct a definitive and exclusive list of mechanisms capable of causing a condition that is apparently not its own disorder but rather an umbrella term for neurological injury in general (and the patent unlikelihood that there are only two possible mechanisms of causing brain injury). This is not dispositive, but it further weakens defendant's assertion that TIND is not a medical diagnosis.

Third, defendant conflates the severity of an injury with the severity of the trauma that caused it—a fallacy to which he himself objected in his motion to exclude the testimony of plaintiffs' expert Dr. Woodcock. *See* ECF No. 42 at 8. There, defendant argued that it was inappropriate and unreliable for Dr. Woodcock to reason that "because he diagnosed plaintiff with substantial injuries and impairments…the accident was substantial." *Id*. That is exactly what defendant's expert seeks to do here: to reason that because plaintiff was diagnosed with a "mild concussion," the trauma that caused it must also have been mild. This inference, as defendant recognizes, is not scientifically valid.

Fourth, because the threshold of force for an *average* "confirmed case" of TIND does not represent or necessarily include the lower bound of force required to cause any given *individual*

case of TIND, that calculation cannot be used to prove that a given impact did not cause neurological injury.  Furthermore, the average threshold value is a retrospective value that relies on the neurological disorder's being diagnosed and recorded by the medical establishment.  Therefore, because more minor dysfunction might go undiagnosed and untreated it is even less likely to include the lower bound of force sufficient to cause concussion in any individual.

Finally, to exacerbate the skew of the average threshold values used by Vector even further, those values are calculated from a population that is indisputably dissimilar from Mr. Mitchell—professional athletes in the National Football League.  It is inappropriate to conclude that, because a certain level of trauma has been typical among NFL players with diagnosed brain injuries—usually robust physical specimens, relatively young, who play wearing a helmet, and whose professional livelihoods are imperiled by reporting injuries—lesser head traumas cannot produce TIND among 56-year-old unhelmeted men who strike their heads on pavement.  That contention is facially and logically unsound.

Defendant argues that the Court here should admit Vector's testimony based on the admission in *Gould v. Union Pacific Railway Co.* of a biomechanical engineer's expert opinion that "based on the biomechanical forces in action and the objective diagnoses, plaintiff likely was not injured in the way she claimed." No. 19-cv-02326-PAB-NRN, 2021 WL 4428286, at *4 (D. Colo. Sept. 27, 2021).  But *Gould* is inapt here.  The expert there questioned the veracity of plaintiff's claim that she was hit directly on the head with rocks because the medical record "showed no head injuries related to rocks," and because, based on the trajectory of a falling rock, it was mechanically improbable that that instrument could have caused her injuries.  *Id*.  Here, by contrast, plaintiff's medical records indisputably reflect that plaintiff struck his head during the accident, and the disputed opinion is not a mere reconstruction of the possible trajectories of a

falling object but rather naked speculation about what magnitude of impact is necessary to produce an injury with neurological sequelae for a particular person.

Similarly, defendant's citation to *Adamscheck v. American Family Mutual Insurance Co.* is not compelling. *See* 818 F.3d 576, 589-90 (10th Cir. 2016). There, the Tenth Circuit found the trial court's exclusion of an expert opinion that "would have provided an alternative explanation of causation to that offered by [plaintiff's] medical experts" to be reversible error. *Id*. at 589. The expert's opinion there was based largely on the plaintiff's documented pre-existing spinal injury due to a weight-lifting incident one year earlier. *Id*. at 590. Here, by contrast, Vector does not seek to attribute Mr. Mitchell's symptoms to another accident or injury. It bases its opinion on studies of competitive athletes in helmeted sports—data with only a tenuous factual connection to the accident at issue. The exclusion of this opinion will neither deprive defendant of an "alternative explanation" for plaintiff's symptoms nor rob the jury of any reliable information. *Adamscheck* therefore does not compel admission of this testimony.

In short, the Vector experts are not qualified to opine that plaintiff has TIND, and even if they were, their opinion that the collision is inconsistent with TIND is unreliable. Plaintiff's motion to exclude this testimony is granted.

## GENERAL MOTIONS IN LIMINE

### I.   DEFENDANT'S GENERAL MOTIONS.

#### A.   Liability coverage.

The parties do not dispute that it is inappropriate to refer to defendant's liability coverage. This unopposed motion is granted.

### B. Financial status.

Plaintiffs may not argue for compensation based on the depth of defendant's pockets

However, facts admissible for other reasons may inadvertently reveal information about

defendant's financial status.  For example, evidence of a witness's state of residence, education,

and occupation is reasonable background information that is generally admissible because it

"allows the jury to make better informed judgments about the credibility of a witness and the

reliability of that witness's observations."  *United States v. McVeigh*, 153 F.3d 1166, 1201 (10th

Cir. 1998), disapproved of on other grounds by *Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999).

If defendant testifies, these questions are permissible.

As another example, evidence relevant to a contested issue is admissible unless

foreclosed by another rule of evidence.  *See* Fed. R. Evid. 401.  Therefore, information such as

the fact that defendant was driving a Cadillac Escalade is admissible as foundation for

calculations that involve the height, weight, and shape of that car.  Evidence about the frequency

or purpose of defendant's visits to Aspen, by contrast, tends to prove his familiarity with the

intersection where the crash occurred and little else, and therefore is not relevant unless

defendant disputes that his conduct was negligent.

Plaintiffs apparently wish to introduce some type of evidence concerning Mr. Rosenthal's

presence in Aspen as "res gestae" evidence.  The court in *Securities and Exchange Commission*

*v. Goldstone* noted that it could not find any civil Court of Appeals decisions "applying res

gestae by name in this specific context," but it nevertheless permitted the SEC to introduce

emails and documents that were not related to the particular event at issue but that gave "relevant

background information" and were "important to paint the picture" of the defendants' "difficult

position" at the time of the alleged misconduct.  No. CIV 12-0257 JB/LFG, 2016 WL 3996384, at *20 (D.N.M. June 27, 2016).  It is unclear from plaintiffs' response here what res gestae evidence plaintiffs have in mind.  Suffice it to say that, assuming there is an unequivocal admission that Mr. Rosenthal's negligence was the cause of the accident, I cannot imagine how his reason for being in Aspen that day or whether he had property in the Aspen area would be relevant in this case.

### C.  "Golden Rule" and "Reptile Theory" arguments.

Defendant seeks to preclude plaintiff from making "golden rule" arguments (which ask the jury to imagine itself in the plaintiff's position) or "reptile theory" arguments (which purportedly appeal "to jurors' self-interest about the best interests of the community" and "rel[y] on fear" to encourage larger damages awards).  The short answer is that arguments of that type will not be permitted in this trial.

## II.  PLAINTIFFS' GENERAL MOTIONS

### A.  Motives, timing, and purpose of filing suit, retaining counsel, and hiring experts.

1.  Plaintiffs' Motives for Filing Suit.

Plaintiffs seek to preclude defendant from impugning their motives for filing this lawsuit, such as by suggesting that plaintiffs are greedy or that they are trying to win the "lawsuit lottery."  That kind of name-calling has no place in this lawsuit and will not be permitted.  In any event, plaintiff's motive for filing the lawsuit, other than the obvious motive of obtaining a money judgment, is not relevant.  If there were evidence of an abuse of process or fraud of some kind, then motivation possibly could become relevant.  *Cf., e.g., Caldwell v. Wal-Mart Stores, Inc.*, 229 F.3d 1162, (10th Cir. 2000) (Table) (absent evidence of fraud, plaintiff's motion to

bring a suit is not admissible).  The Court is aware of no evidence that would reasonably bring plaintiffs' motives into play in this case.

Defendant notes the stock instruction used by Colorado state courts to inform the jury that, in judging the credibility of a witness, they may consider any motive the witness might have to favor a particular result.  *See* CJI-Civ 3:16 (2018 ed.).  Similar instructions are no doubt given in virtually every court in the land.  If, for example, a witness has a close relationship to a party or stands to receive some benefit depending on the result of a case, that can be considered by the jurors in assessing that witness's credibility.  However, the instruction is not an open invitation to impugn the motives of the plaintiffs or their counsel in bringing a lawsuit.

2.  Timing of plaintiffs' retention of counsel.

Plaintiffs cite *Carlyle v. Lai*, a Missouri state court case, for the proposition that "counsel risk reversal when attempting to discredit a litigant by cross-examining him about the time and circumstances of his having consulted an attorney to discuss and exercise his legal rights."  783 S.W.2d 925, 929-30 (Mo. Ct. App. 1989).  I agree that when a plaintiff retained counsel is ordinarily irrelevant.  People have a right to seek and obtain counsel at any time.

I can imagine situations, however, where the hiring of counsel could possibly be relevant. For example, if there were evidence that plaintiffs told one story about their injuries before they hired counsel, but after hiring counsel they materially changed their story, that possibly could be admissible as bearing on the plaintiffs' credibility.  If, as defendant claims, Mr. Mitchell was treated by and "discharged" (whatever that means) by providers in his hometown but then went to a second set of providers recommended by counsel and was diagnosed and treated for more extensive injuries, those facts could be relevant to plaintiffs' credibility and the extent of the injuries caused by the accident.  In those scenarios it would not be the timing of Mr. Mitchell's

retaining counsel as such but rather the difference in the diagnosis and treatment before and after

retaining counsel that would make the facts relevant.  I would have to know more about the

evidence defendant has before I would let counsel open that door.

     3.  <u>Relationship between plaintiff's counsel and expert witnesses.</u>

Defendant contends that plaintiffs' counsel sent Mr. Mitchell to a new group of providers

known to counsel, and that these "hired guns" enhanced Mr. Mitchell's diagnosis and treatment

to benefit plaintiffs' case.  The fact that a lawyer recommends that a client be seen by a particular

treating professional is not improper.  After all, counsel has a responsibility to represent the

client.  Recommending a particular expert could be an appropriate part of the representation.

Nor is the fact that there is a history among counsel and certain providers conclusive proof that

the providers' diagnoses and treatment recommendations are biased.

This is not to say, however, that the relationship between plaintiffs' counsel and an expert

is off limits.  For example, defendant can introduce evidence, if there is any, that plaintiffs'

counsel recommended that Mr. Mitchell be seen by a particular provider with whom plaintiffs'

lawyers have had a relationship in the past.  They can introduce evidence about the expert's

litigation history, such as how often the expert has been retained to testify in lawsuits, whether

the expert has typically been retained by plaintiffs in personal injury cases, and what percentage

of the expert's income is derived from being an expert in legal cases.  They can introduce

evidence of the different diagnosis and treatment recommendations between plaintiffs' original

providers and counsel's recommended providers.

Thus, depending upon the evidence, a defense counsel could argue that it is reasonable to

infer that the expert is not an independent, impartial expert due to his or her relationship with

counsel or history as a witness for plaintiffs. Again, I need to know more about what evidence defendant has to make decisions about what is relevant and admissible in this case.

4. <u>Preparation of expert reports</u>.

Finally, plaintiffs ask the Court to preclude defendant from offering evidence that expert reports were drafted by plaintiffs' counsel. This issue arose earlier in the case in the context of defendant's desire to obtain copies of five non-retained experts' draft reports on the theory that plaintiffs' counsel drafted them. The Court initially sided with the defendant. However, after obtaining more information about what was and was not provided by counsel to the experts and reviewing the draft and final reports of the experts *in camera,* the Court found the facts to be different than as it initially understood them. I found,

> Counsel drafted what in substance were disclosures of the opinions of non-retained expert witnesses, based on counsel's review of the medical records and conversations with the witnesses. The disclosures were drafted in the format of expert reports. The witnesses reviewed the drafts and, with the possible exception of Ms. Shyam as noted above, made changes as they deemed appropriate. I would not expect these health care professionals to draft reports from scratch. In this case, at least, they were in the business of treating the patient, not writing reports. I have found no evidence that counsel put them up to forming or expressing opinions that differed from the opinions they formed in the course of treatment. I do not find that there is a factual or legal basis to require disclosure of the drafts or the email correspondence to defendant's counsel in the circumstances.

ECF No. 54 at 9.

For much the same reasons I conclude that unless defendant has evidence showing that plaintiffs' counsel did more than assist an expert in reducing to a written report format the findings and opinions of an expert witness, defendant may not introduce evidence that counsel drafted the reports of plaintiffs' experts. Doing so would be an improper attempt to impugn the integrity and professionalism of counsel.

**B. Collateral source evidence.**

The parties do not dispute that it is inappropriate to refer to plaintiffs' collateral health insurance benefits and payments. *See* C.R.S. § 38-27.5-103 (September 2021). This unopposed motion is granted.

## ORDER

1. Defendant's Motion to Strike or Limit the Testimony of Plaintiffs' Experts Rust, Shyam, and Elsila Pursuant to Fed. R. Evid. 702 and 403, ECF No. 40, is GRANTED IN PART AND DENIED IN PART. It is denied as to Dr. Rust and for the most part denied as to Ms. Shyam and Ms. Elsila, with exceptions as noted in this order.

2. Defendant's Motions in Limine, ECF No. 41, are GRANTED IN PART AND DENIED IN PART.

3. Defendant's Motion to Limit Testimony of Plaintiffs' Expert Jonathan Woodcock, M..D., Pursuant to Fed. R. Evid. 702 and 403, ECF No. 42, is GRANTED IN PART AND DENIED IN PART.

4. Plaintiffs' General Motions in Limine, ECF No. 43, are GRANTED IN PART AND DENIED IN PART.

5. Plaintiffs' Fed. R. Evid. 702 Motion to Exclude Testimony and Opinions of J. Michio Clark, Ph.D. and Zachariah Weimer, P.E., ECF No. 44, is GRANTED IN PART AND DENIED IN PART.

DATED this 11th day of October, 2022.

BY THE COURT:

R. Brooke Jackson
United States District Judge